## WILLIAM J. CARROLL, Respondent, v. NEW YORK LIFE INSURANCE COMPANY, a Foreign Corporation, Appellant.

(193 N. W. 471.)

**Insurance — questions of waiver and estoppel in an action on life insurance policies held for the jury.**

In an action upon policies of life insurance, where the insurance company seeks to exercise the right of forfeiture for failure to pay an annual premium, it was *held*, following the law of the case announced upon a former appeal, and, for reasons stated in the opinion, that the questions of waiver and estoppel concerning the exercise of such right, were for the jury.

Opinion filed December 30, 1922.  Rehearing denied May 12, 1923.

Insurance, 33 C. J. § 869 p. 136 n. 80; Life Insurance, 37 C. J. § 449 p. 649 n. 47.

Action in District Court, Ward County, *Moellring*, J., upon two policies of life insurance.

Defendant has appealed from the judgment.

Affirmed.

*Newton, Dullam & Young,* for appellant.

There is nothing mysterious about a contract of insurance; it requires the assent of both parties to the same things as in any other contract. Stevens v. Insurance Co. 87 Iowa, 283; Weidenaar v. New York Life, 94 Pac. 1.

No other or different rule is to be applied to a contract of insurance than is applied to other contracts. Rathbun v. New York L. Ins. Co. 30 Idaho, 34; Quinlan v. Phœnix Mut. L. Ins. Co. 140 N. Y. 79; Dwight v. Germania L. Ins. Co. 103 N. Y. 341; Foote v. Aetna L. Ins. Co. 61 N. Y. 571; Liverpool & L. G. I. Co. v. Kearney, 180 U. S. 134; Imperial Fire Ins. Co. v. Coos County, 151 U. S. 450; Crane v. City Ins. Co. 3 Fed. 558; Wells, Fargo v. Pacific I. Co. 44 Cal. 37; Goodrich v. Treat, 3 Colo. 408; Connecticut Mut. L. Ins. Co. v. Pyle, 45 Ohio St. 19; Iowa Life v. Lewis, 187 U. S. 335; Behling v. Northwestern Nat. Ins. Co. 117 Wis. 24.

Under the terms of the policy, as qualified by the practice of the company, the agent was without authority to waive full and timely payment of the premium, save as he could adjust the payment conformably to the blue note plan. His authority turned upon the giving of the note, which was a matter of real substance, and not of mere form, as is shown by the terms of the note, before quoted. See White v. New York L. Ins. Co. 200 Mass. 510, 86 N. E. 928.

It must be remembered, however, that when the plaintiff was made beneficiary on July 28, 1913, the premium due June 15, 1913, had not been paid, the time for the payment having been extended by the "blue note" plan to September 15, 1913. The further extension of time for the payment of the premium, granted on September 15, 1913, was simply a renewal of the extension granted June 15, 1913, and, in effect, was beneficial to the beneficiary, as without such extension the policy would have lapsed sooner than it did. In the second place, the "blue note" did not change or attempt to change the terms of the policy itself, as it expressly stipulated that if the amount due at maturity was not paid, the rights of both parties should be the same as if no agreement

had been made. Sims v. Jefferson Standard L. Ins. Co. 18 Ga. App. 347, 89 S. E. 445.

A note given by insured to insurer to cover a life policy premium, not being taken in payment of the premium, but as an agreement for extension of the time of payment of premium from its date, when it was not paid there was a default in the premium payment from the date of the note. Underwood v. Jefferson Standard L. Ins. Co. (N. C.) 98 S. E. 832.

A soliciting agent has no power or authority to waive any of the provisions of a policy contract after the same has been executed, delivered and put in full force and effect. Phipps v. Union Mut. Ins. Co. 150 Pac. 1083; Fidelity Mut. Ins. Co. v. Russel, 75 Ark. 25, 86 S. W. 814; Bryan v. Nat. L. Ins. Asso. 42 Atl. 513, 21 R. I. 149; New York L. Ins. Co. v. O'Dom, 100 Miss. 219, 56 So. 379; Cayford v. Metropolitan L. Ins. Co. (Cal.) 91 Pac. 266; Madsen v. Maryland Casualty Co. 142 Pac. 51; Iowa L. Ins. Co. v. Lewis, 187 U. S. 335; Globe Mutual Life Ins. Co. v. Wolff, 95 U. S. 326, 24 L. ed. 387; Mutual L. Ins. Co. v. Abbey, 76 Ark. 331, 88 S. W. 951; Union Mut. L. Ins. Co. v. McMellan, 24 Ohio St. 67; Metropolitan Life Insurance Co. v. Hall, 4 Va. 572, 52 S. E. 345; Lewis v. Phoenix Mut. L. Ins. Co. 44 Conn. 72; Metropolitan L. Ins. Co. v. McGraff, 52 N. J. L. 358, 10 Atl. 386.

Under the terms of the policy limiting the agent's authority the insured is conclusively presumed to know that no engagement entered into between him and the agent who took the application extending the time for payment for premiums is binding on the insurer unless brought to its knowledge and ratified by it. Collins v. Metropolitan L. Ins. Co. 32 Mont. 329, 108 Am. St. Rep. 578, 80 Pac. 609; Security L. Ins. Co. v. Eades, 152 Ky. 577, 153 S. W. 989; McElroy v. Metropolitan L. Ins. Co. 84 Neb. 866, 23 L.R.A.(N.S.) 968, 122 N. W. 27; Greenwood v. New York L. Ins. Co. 27 Mo. App. 409.

It is well settled that a party dealing with the agent of a corporation must at his peril ascertain what authority the agent possesses, and is not at liberty to charge the principal by relying upon the agent's assumption of authority which may prove to be entirely unfounded. Rice v. Peninsular Club, 52 Mich. 90, 17 N. W. 708; Meachem, Agencies, 137; Plano Mfg. Co. v. Root, 3 N. D. 165, 54 N. W. 924.

It is well settled in this state that the declarations of an agent are not

competent proof of his authority to act and that the principal is not responsible or bound by the declarations of an agent not made in the course of an agency. Rounseville & Doty v. Paulson, 19 N. D. 466, 126 N. W. 221; Bacon v. Johnson, 56 Mich. 182, 22 N. W. 276; Coon v. Gurley, 49 Ind. 199; Saussy v. Southern Florida R. Co. 22 Fla. 327; Graves v. Horton, 38 Minn. 66, 35 N. W. 568; Blevins v. Pope, 7 Ala. 371; Cannon v. Lindsay, 85 Ala. 198, 7 Am. St. Rep. 38; Little v. Little, 2 N. D. 175, 49 N. W. 736; Quimby v. Shearer, 56 Minn. 534; 58 N. W. 155.

*Palda & Aaker,* for respondent.

## Statement.

BRONSON, J. This is a consolidated action upon two policies of life insurance. Defendant has appealed from a judgment entered upon a verdict in plaintiff's favor. The same cause was heretofore before this court. 180 N. W. 523. Then plaintiff appealed from a judgment of dismissal entered upon a verdict directed at the close of plaintiff's testimony. Pursuant to the order of this court, a new trial was had. The salient facts have been fully set forth in the previous opinion of this court. It is unnecessary to restate theme in detail excepting as additional testimony or purposes of this opinion so require. The facts are: In June, 1916, plaintiff's son, then aged nineteen, applied to defendant for insurance upon his life. Two ordinary life policies, dated July 7th, 1916, one for $3,000, the other for $2,000, were issued, payable to plaintiff, his father, as beneficiary. In the former policy, the premium was $57.30, in the latter, $38.20, payable annually on June 23d. The policies recited the payment of such premiums for a period terminating June 23d, 1917. One Kane had been an agent and solicitor of defendant for insurance during some thirteen years. In some respects, he was distinguished in the service of defendant, belonging to the so termed $200,000 club. For many years, since November, 1908, at Minot, North Dakota, as such agent and solicitor, he represented the defendant. During the past eight or nine years he has devoted practically all of his time to such business. At Grand Forks defendant maintains a branch office. There it has an agency director or manager over the agents in the state. This branch office receives premiums from

49 N. D.—51.

agents and attends to the collection of renewal premiums. It furnishes reinstatement blanks. It has authority to reinstate policies of $2,000 within thirty days after the grace period allowed. The policies, however, provide that at any time after default, upon written application by the insured and upon presentation at the home office of evidence of insurability satisfactory to the company, they may be reinstated. In 1918 Kane moved to Grand Forks. He has a private office there connected with the branch office, the rent for all of the rooms of which is paid by defendant. Previously, he occasionally visited Grand Forks for purposes of conferring with the agency director or the cashier of the branch office. At Minot, Kane represented himself to be the agent of defendant. There, as Kane testified, he tried to let them know that the defendant insurance company was on the map at all times. He had known plaintiff since 1905 or 1906. Plaintiff has lived in Minot since 1887. Frequently, before and after 1916, Kane talked and solicited life insurance from plaintiff. In 1916, Kane solicited the life insurance involved from plaintiff and his son. On June 23d, 1916, the son signed an application for a policy for $2,000 and for $3,000. Kane witnessed the application. After his signature is the statement: "Other agents, none." On June 24th, 1916, the son submitted to and passed medical examination. Plaintiff gave to Kane a note for the premium. Kane cashed the note. Plaintiff later paid the note at the bank. Kane received the policies and delivered them to either plaintiff or his son. It was Kane's duty to collect and to remit the first premium to the branch office. The records of this branch concerning these policies show that Kane was the agent for the same. That he was entitled to a commission of 55 per cent or $52.53 of this first premium and that the premium was paid on August 14th, 1916.

Kane, as agent, operated under an agreement between him and defendant dated September 1st, 1910. This agreement is countersigned by the agency director of the branch office. The agreement constitutes Kane a special agent for the purpose of canvassing applications for insurance and of performing such other duties in connection therewith as the officers of the company may in writing expressly require of him. It provides that Kane shall have no authority to accept risks of any kind, to make, modify, or discharge contracts or to extend the time for paying any premium, to waive forfeitures, or to receive any moneys due

or to become due, excepting upon applications obtained by him or upon policies or renewal receipts sent to him for collection. It inhibits Kane from placing any application for life insurance with any other company except with defendant's consent.

The insured belonged to the National Guard which, in 1916, was ordered to the Mexican border. The son performed service there but returned to Minot before enlistment. On June 4th, 1917, at Minot, he enlisted in our United States Army. The premiums fell due on June 23d, 1917.

The policy provides for a grace period of one month during which every premium after the first may be paid. On July 14th, 1917, the plaintiff wrote to the branch office to the effect that he did not receive the policies until after four months so that he figured that he had no insurance for that period of time. That the policies are so patched up with clauses that if his son were killed in any country outside of the United States, his estate would receive little or nothing on such policies. That if such was the company's way of doing business he did not feel like putting up $95 more for this year's premium. That if they wished to change the policy and make them a straight life, whether his son is in the army or not, he would pay up the premium. That he preferred to give his note for ninety days as he had just invested considerable money, but he could send the cash if they insisted on it. On July 19th, 1917, the cashier of the branch office wrote to the plaintiff to the effect that the full insurance took effect on June 23d, 1916, and plaintiff was fully protected. That their records did not show that the policies had any restrictions and that they were liberal contracts indeed. That if plaintiff would forward policies they would be pleased to proceed to do all that they could to adjust matters to his complete satisfaction for the New York Life's aim is to at all times satisfy their policy holders. That it gave him pleasure to attach herewith two extension agreements of $30 and $45 due September 23d which should be signed by his son and returned with a deposit of $20.50. That he trusted that this deposit would be made within the thirty days' grace which expired July 23d. These extension agreements are the so-termed blue notes, one of which is fully set forth in the former opinion of this court. See 46 N. D. 588, 180 N. W. 525. These two blue notes were signed by both the plaintiff and his son. On July 21st, 1917, he wrote to the company

at Grand Forks to the effect that he inclosed the two policies also the notes and check for $20.50. That he wanted a straight policy that was good in any country with no notice to be given the company because the company knew that the boys would not have a chance to do such things in war time. That he wanted a twenty-year payment plan. On July 31st, 1917, the cashier of the branch office wrote to plaintiff to the effect that he had the policies. That he noted the indorsement on the policies which provides that during the first two years, if the insured shall engage in military service, etc., outside of the United States and shall die in consequence thereof, the amount shall be limited to one fifth of the face amount. That the policies are already over one year old and on the second year. That as liberal contracts as these could not be secured at this time by his son in view of the condition of the war. That they are splendid contracts indeed, and the military provisions expire June 23d, 1918. That he was securing figures on the twenty payment life basis and would advise him further in due course. That meanwhile the policies were being held subject to his order. Before the time when these blue notes became due, plaintiff, in accordance with his testimony, had several conversations with Kane at Minot. The substance of these conversations has been heretofore stated in the former opinion. See 46 N. D. 588, 180 N. W. 526. Plaintiff's son was then in the military service of our government. Mobilization was then taking place in this section of the state for transportation to France. Plaintiff was concerned, not about paying the notes because he knew he could pay those, but about the insurance policy provision. He talked with Kane about this in several conversations. The particular conversation he detailed was about September 17th or 18th, 1917, before the notes became due. Kane advised him that he had nothing to worry about; that the company was making, or had made, arrangements with the government so that the government was going to take care of the premiums. Kane talked about his trips to New York and his connection with the company. He told plaintiff that he was in good standing with the company and his word went a long way; that the policies were all right; that all that was necessary was a letter from the captain that his son was in the service or that he wanted to take advantage of the arrangement the government was making. Another witness testified that he heard a part of this conversation and that Kane told plaintiff

that everything would be all right. On September 26th, 1917, the branch office sent a form notice to the insured, noting therein failure to pay the note given in connection with the premium due June 23d, on the policy which has lapsed for nonpayment of such premium. It inclosed an application for reinstatement; requested answer to the questions therein, and its return together with $45.56. On September 27th, 1917, this branch office wrote to the plaintiff inclosing the policies and stating that they could not hold them in suspense for an indefinite period; that the blue notes became due September 23d, 1917, and, as they were not paid when due, the policies were lapsed, and that they were so advising the insured under separate cover; that they trusted his son would be in a position to apply for reinstatement and would forward requirements called for in the letter at an early date in order that prompt action might be taken. On October 27th, 1917, this branch office, wrote to plaintiff. A copy of the letter is set forth in the former opinion. After the plaintiff received this letter he talked with Kane who informed him that the company had made arrangements to take care of these premiums through the government. He advised plaintiff that he had nothing to worry about; that the company was looking after it. As this letter discloses, a copy had been sent to Kane by the Grand Forks office. Plaintiff further testifies that after he got the letter he sent the papers he had received from the company to his son at Camp Greene; that then, they were going from one place to another; that sometimes his son would get his letters and sometimes not. Otherwise, he testifies that his son was in camp some three or four months before he sailed; that they left for France in December and landed there on Christmas day. On December 26th, 1917, plaintiff wrote to the branch office that he had that day received the policies; that he was sorry this had happened but, if not too late, he would send a check for one half if the company would take his note for ninety days for the balance; that he had been so hard up this fall, he could not see any crop and the laundry had been losing money every month. Otherwise, in the testimony it appears plaintiff relied on the statements made by Kane. The blue notes never were returned to him. He thought they were a liability for which he could be held responsible; he never read the fine print in the blue notes. He was financially able to pay them. In fact, later, he borrowed $15,000 on his straight note. Kane, in his

testimony, states that he had no instructions from the branch office or the company to undertake a collection of the renewal premiums due in 1917, that he had no instructions to tell plaintiff that either the company or the government would carry the insurance on the life of the deceased while he was in military service; that he did not make such statements to plaintiff. He admitted that he was a licensed agent, pursuant to license issued by the insurance commissioner of this state, which authorized him, as agent, to transact the authorized business of defendant in this state. He testified that he was interested in the soldier boys; that he was in Washington and New York along in the summer of 1917; that he talked with the officers of the company in New York about the war provisions to be made by Congress for the purpose of taking care of premiums of our soldiers; that the life insurance companies were very much interested in it; that he talked considerable with the officers of the company about it. In Washington he talked with congressmen and senators about it. That in this second premium he had a 15 per cent commission to be earned; that usually he got notice after a policy lapsed; that he received a copy of this letter of October 27th, that he understood when he receives a special notice that the company meant that he should try to keep the policy from lapsing; that one of the things the company expected him to do in his agency was to see if renewals could not be fixed up or lapses reinstated. That he is interested in every policy that he has on the books of the company as agent of the company. A lapsed policy means a loss for the company. When he receives copies of these special letters concerning lapses he tries, if possible, to put it back again and fix it up. He admits having conversations with the plaintiff, but he thinks he remembers telling him once if there was any liability he did not need to worry, the company would pay the claim if there was any liability.

The cashier of the branch office testified: She took her position as such September 27th, 1917; she is in charge of the cashier's department. Her office received the renewal receipts for the premium due in June, 1917. The function of her department is the handling and collection of renewal premiums. Neither the notes nor the renewal receipts were ever turned over to Kane for attention; she has examined the records of the office and has found no authority in writing given to Kane to deal with the renewals on these policies. She sent the renewal receipts and

the notes back to the home office when the policies lapsed, the exact date of which she does not remember. She never received notice that Kane had assumed to act for the company with reference to these renewals or that he had made any representations to plaintiff. Mr. Habeck preceded her as cashier; he did not testify. The agency director did not testify. Anderson, comptroller of the head office, testified by deposition. He explained the records of the company and their methods of keeping an account of the premiums. That the renewal receipts were mailed to the cashier, Habeck, at Grand Forks under definite instructions and under specific written rules; that Kane was not authorized to take any action about such renewal premiums. So far as defendant's records showed, the premium on the policies due June 23d, 1917, had not been paid Lewis, the contract register of the home office testified through deposition. He testified that the contract designating Kane as a special agent was the only contract ever made with him concerning his agency; he identified the book of instructions given to agents. Lindsay, the superintendent of agencies at the home office testified through deposition that the scope of Kane's authority as agent was limited by his written contract of agency. Reference thereto has heretofore been made. That Kane had nothing whatever to do with the collection of any renewal premium concerning the policies involved.

Defendant contends that, under the contract, the policy was not in force beyond the date when the next premium fell due including the grace period of one month; that the note extension extended the insurance and the right to pay the premiums until midnight of September 23d, 1917; that the failure of the makers to pay the notes at such time automatically abrogated any claims against the makers under their very terms; that the blue notes did not change the terms of the policy but that their rights remained the same as if no agreement had been made thereunder; that no waiver is established because the agent became possessed of no authority thereafter to waive any provisions of the policy or the agreements made, and had no authority to solicit or collect a renewal premium; that the trial court erred in reception of evidence concerning the declarations and representations of the agent, Kane.

## Decision.

The facts presented upon this record are substantially the same as

those presented upon the former appeal. The exception is that now they are more complete, and the record thereof more extensive. In the present record Kane's authority as an agent, and his actions in representing the company have been much more fully detailed through testimony elicited by both plaintiff and defendant. Defendant has explained in the testimony the limitations upon the authority of Kane, as the agent, and the proceedings had by the home office and branch office in the consideration of these policies, and the collection of the renewal premium. The facts now presented are, accordingly, substantially the facts presented upon the former appeal, with the additional facts showing the limited authority of Kane, as a special agent of defendant. Upon the former appeal this court held that the question of waiver of the right of forfeiture was for the jury. Upon this question the jury, upon the new trial, have decided in plaintiff's favor. The instructions of the trial court are not challenged. The only question presented, therefore, is whether, as a matter of law, the present record presents any evidence to support the jury's finding of waiver by the defendant. The law of the case is announced by the previous opinion of this court. To a large extent defendant now presents arguments and authorities upon the questions that were fully considered heretofore by this court through defendant's former brief and petition for rehearing. It is unnecessary to restate the law applicable upon the facts as heretofore stated in the former case. We are of the opinion that in some respects the present record contains more substantial evidence for submission to the jury than the former record. We are also of the opinion that the evidence of defendant concerning the limited contract with Kane and the denial of any authority possessed by Kane to make any representations, or with authority to do any act concerning the collection, or renewal, of the second premium, does not, as a matter of law, destroy the right of consideration by the jury, of the facts presented by plaintiff's case. On the present record peculiar and unusual facts are presented. Defendant is demanding its bond of forfeit according to the letter and word of the contract made.

There is a good faith that searcheth the conscience of the parties in every transaction; the good faith of the giver, of the receiver, for right and for justice. The law, ever seeking, as its raison d'etre, to render every one his due, is ever ready to hear and apply good faith. Waiver

and estoppel are handmaidens, closely related, that assist. The conscience of the defendant must be found in the actions of its representatives, for it has no actual identity or entity except through the fiction of the law which gives to it a status. For its right of forfeiture, defendant invokes the law of agency, the principle that the principal cannot be bound except through authorized acts of its agent. Invoking principles of agency, defendant, reciprocally, must be bound by the law that applies to the relation.

As a foreign insurance corporation, defendant, by the law of this state, is permitted to do business in this state only through its authorized agents, who must be residents of and have their office and place of business within, this state. Comp. Laws, 1913, § 4926. Upon this record, defendant had two representative agencies in this state. The branch office at Grand Forks, and Kane, at Minot, later at Grand Forks. The cashier of the branch office, for a part of the time, alone, testified. From her testimony, limited as it is, it does appear that this branch office has an agency director or manager. That it has authority to receive applications and remittances for first premiums. That it has authority to collect renewal premiums sent to it and, to a certain extent, to make reinstatements of policies. It was the custom of Kane to confer with this agency director. Later, he had an office connected with this branch office. Even under the special contract with Kane there might have been conferred upon him a duty and power concerning renewal premiums. It is certain that a duty and power was so conferred upon the branch office. Kane was a man of long experience with the company. He enjoyed its confidence. He had close connections or relations with the branch office. It may be noted that the agency director did not testify. The record further does not disclose the agency director was a licensed agent in this state. It does disclose that the authorized and licensed agent of defendant, resident in the state, was Kane. He was not authorized to act as agent for defendant until the commissioner of insurance had issued to him a certificate of insurance showing that the defendant had complied with the requisites of the law. Comp. Laws, 1913, § 4920. To Kane, through state authority, there was issued a certificate which certified that defendant had appointed him, a resident of Minot, its agent for the transaction of its authorized business of insurance in this state. It is admitted that this agent Kane

was authorized to solicit this insurance, take the application therefor, collect the first premium and to remit it to the branch office, and to deliver the policy to the insured. It is admitted that Kane was interested financially in the collection of the second premium; that it was his duty to prevent policies from lapsing and to exercise his best endeavors to so prevent. When Kane solicited this insurance he knew the status of the insured as a member of the National Guard. War time conditions then were at hand. The disclosure was made in the application. Upon the policy there was a rubber stamp provision that if the insured engaged outside of the United States in military service during the first two years of the existence of the policy it should be limited to one fifth of the face amount unless the insured obtained a war risk permit before leaving the United States. Thus was the insurance limited to $1,000 during the first two years of its existence, and thus was defendant possessed of full knowledge of the status of the insured at the very inception of the insurance. The first premium was paid to Kane through a note which was good and thereafter paid. The policy was issued on July 7th, 1916, acknowledging receipt of the premium, when notations on defendant's records disclose that such premium was not paid to the company until August 14th, 1916. The policy was not delivered to plaintiff until about four months after the time of its application, yet, the company reassured plaintiff that the policy had been in full force and effect from June 23d, 1916. But the application provided that the insurance should not take effect unless the first premium is paid and the policy delivered and received by the insured during his lifetime and good health. The son went into military service upon the Mexican border. When the time occurred for the payment of the second premium he had returned. His father, not satisfied with conditions contained in the policy, complained to the branch office requesting changes. He offered to pay the premium in cash, if they insisted, or to give his note. Then his son had already enlisted in military service. Then the United States had become engaged in the World War. His father desired a policy that would apply whether his son was here or abroad. The branch office, in reply, reassured plaintiff and submitted, for payment of the second premium, two blue notes for signatures and a request for payment of $20.50. These notes were signed by both plaintiff and his son and sent, together with $20.50, to the branch office. Plaintiff

thought the so-termed blue notes were notes in fact. He thought he was liable upon them. He was never advised to the contrary and they never were returned to him. As notes they were ingenious. They purported to be notes but the minute they became due they ceased to be notes. In other words they were no obligations at all unless paid. In fine print these so-termed blue notes state that no part of the premium due on June 23d, 1917, had been paid, whereas, as a matter of fact, plaintiff paid, and defendant's records show, $8.20 applied on one policy and $13.30 upon another. This amount of cash, together with the notes, made exactly the amount of premium due for the second year. The policies involved are continuing obligations, subject to forfeiture upon conditions. Throughout the record it appears that plaintiff desired to keep the insurance and that defendant was equally solicitous in preventing a lapse. Throughout the record it further appears that plaintiff was financially able to pay the second premium in cash; that his notes were good and that he thought he had assumed an obligation for the second premium. Before these blue notes became due Kane had conversations with plaintiff concerning the payment of the premium. His representations and statements made to the plaintiff reassured plaintiff that the insurance contained in the policies was valid and would be continued without the necessity for actual payment of cash on September 23d, 1917. Kane appeared to be in a position of authority to make these representations by reason of his connections with the company, with the branch office, and his long standing as sole representative of the company at Minot. The peculiar conditions that then existed concerning soldiers who were at the front and the governmental activities to protect their insurance further served to reassure the plaintiff. When the blue notes became due September 23d, 1917, and the policy then, pursuant to strict interpretation of its contract provisions, terminated and lapsed, then and thereafter the branch office at Grand Forks assumed to act and assumed the authority to act. It proposed an extension and the execution of a new note. It prescribed conditions of reinstatement. It then assumed to have, and it did have, powers of reinstatement. It sent a communication concerning the matter direct to the licensed agent, Kane. He again reassured plaintiff concerning the validity and continuance of the insurance without the necessity of further action. It is apparent that powers and duties were

assumed by the branch office co-operating with Kane concerning the reinstatement of this policy contrary to the express provisions contained in the policy.

The branch office assumed to have a power and a duty, conferred by the home office, contrary to the provisions of the policy that no agent is authorized to waive forfeitures or to make, modify, or discharge contracts. Thus, was the branch office permitted to assume and to accept powers and responsibilities contrary to the right of forfeiture as expressly provided in the policies. Upon this record, in considering the application of waiver and estoppel, there are more elements involved than the mere representations and assurances of the agent Kane. The statute provided that whoever solicited insurance, on behalf of any insurance corporation, or made any contract of insurance, or collected any premium, or in any manner aids or assists in doing either, or in transacting any business of a like nature for any insurance corporation shall be deemed to be an agent of such corporation to all intents and purposes. Comp. Laws, 1913, § 4959. Defendant clothed the branch office with the habiliments of authority contrary to the policy. The branch office, thus clothed, assumed to act and to seek the co-operation and assistance of its agent Kane. Thus, through their activities, so assumed, and so permitted, did they, pursuant to the statute and their representations, appear to have and possess an authority equal to their assumptions. And so, the defendant, as a matter of law, may not hide behind a secret and restrictive agency which it itself, by its acts and statutory regulations, has enlarged, and assert strict enforcement of the policy provisions where the plaintiff, able to perform, has been misled to his prejudice. Therefore, as held in the former opinion of this court, the questions of waiver were for the jury and the findings thereupon should not be disturbed. We are further of the opinion that the trial court did not prejudicially err in receiving in evidence the statements and admissions of the agent Kane which concerned the res gestæ. The judgment is affirmed with costs.

BIRDZELL, Ch. J., and GRACE, J., concur.

ROBINSON, J., dissents.

CHRISTIANSON, J. (dissenting). The defendant is held liable in

this case on account of the acts of its agent, Kane. Upon the former appeal I expressed the opinion that the evidence was insufficient to establish Kane's authority to act for and bind the defendant in regard to those matters where his acts are said to establish waiver and estoppel on the part of the defendant.

I am also of the opinion that the evidence is insufficient in the same respect on this appeal.

## On petition for rehearing.

PER CURIAM. On December 30th, 1922, the decision of this court was filed in this case. The case was decided by a divided court. The majority opinion written by Mr. Justice Bronson was concurred in by Mr. Chief Justice Birdzell and Mr. Justice Grace. Justices Christianson and Robinson dissented. On January 1st, 1923, there was a change in the membership of the court. On that day Justices Grace and Robinson retired from, and were succeeded in, office by Justices Johnson and Nuessle. On January 13th, 1923, the defendant filed a petition for rehearing. The situation confronting this court upon the filing of the petition was this: There were only two members of the court who had participated in the case upon the original hearing who agreed with the disposition of the case made in the former decision, one of the members of the court disagreed with the former decision, and two members of the court had not participated in the former hearing and were wholly unfamiliar with the case in any of its aspects. In view of the circumstances it was thought advisable to order a reargument without determining whether a rehearing should or should not be granted. The reargument was intended to serve a twofold purpose:

(1) To determine whether a rehearing ought to be granted and the conclusions reached in the former opinion as to the law and facts reexamined; and,

(2) Whether in event any ground for rehearing existed the former decision ought to be departed from.

On oral argument counsel were informed by the Chief Justice of the purposes for which reargument had been ordered.

After careful consideration a majority of the court are agreed that the petition for rehearing filed in this case does not present any cause

for which a rehearing ought to be granted. Rule 16, Rules of Practice. The petition is in reality a reargument of the questions determined by the former decision. The mere fact that there has been a change in the membership of the court and that there is either a possibility or a probability that the new members of the court may disagree with the conclusions reached in the former opinion does not afford any reason for a rehearing. 4 C. J. 625. The petition for rehearing is, therefore, denied. The members of the court who participated in the former decision adhere to the views then expressed. Justices Johnson and Nuessle express no opinion as to correctness of the former opinion; but they agree that no cause has been presented requiring a rehearing. In other words, the majority of the court are of the opinion that the questions presented in the petition for rehearing were all disposed of adversely to the defendant by the former decision; and that in making such decision the majority of the court, as then constituted, had before them and considered all the facts; and that it is not shown that they overlooked any controlling decision or statute.

BRONSON, Ch. J., and CHRISTIANSON, BIRDZELL, NUESSLE, and JOHNSON, JJ., concur.