Beatrice Glasser, Selma Melvoin, Bessie Altschuler, James Booth, and Ruth G. Booth, Appellants, v. Essaness Theatres Corporation, Woods Amusement Corporation, Edwin Silverman, Edward Blackman, Velma Silverman, Appellees and Cross-Appellees. Minnie Stern, Cross-Appellant.

Gen. No. 45,370.

FRIEND, J., dissenting.

Opinion filed June 18, 1951. Rehearing opinion allowed September 17, 1951. New opinion filed February 4, 1952. Rehearing denied February 18, 1952. Released for publication March 25, 1952.

JOHNSTON, THOMPSON, RAYMOND & MAYER, and ROSENBERG, STEIN & ROSENBERG, all of Chicago, for cross-appellant; SAMUEL W. BLOCK, EDWARD E. LYNN, JOSEPH ROSENBERG, MERWIN ROSENBERG, and AARON L. STEIN, all of Chicago, of counsel.

EDWARD J. BLACKMAN, and J. FREDERICK HOFFMAN, both of Chicago, for appellees; ODE L. RANKIN, of Chicago, of counsel.

MR. JUSTICE NIEMEYER delivered the opinion of the court.

Plaintiffs and defendant-counterclaimant appeal from a decree entered after hearing by the chancellor, dismissing for want of equity the complaint and counterclaim seeking, with other relief, the declaration of a constructive trust in certain real property in the Chicago Loop alleged to have been purchased by defendant Essaness Theatres Corporation, hereinafter called Essaness, in violation of its fiduciary obligations as agent of appellants and defendant Velma Silverman, co-partners in the management and operation of the Woods Theatre. June 18, 1951 the decree was reversed and the cause remanded by a divided court, MR. JUSTICE TUOHY writing the opinion and MR. JUSTICE FEINBERG concurring. On the same day JUSTICES BURKE and FRIEND succeeded JUSTICES TUOHY and FEINBERG as members of the court. July 19, 1951 within the time as extended by this court as now constituted, defendants filed a petition for rehearing. September 17, 1951, a rehearing was granted by a divided court, MR. JUSTICE FRIEND dissenting. Thereafter, on October 5, 1951, in their answer to the petition for rehearing, plaintiffs for the first time objected to the participation of JUSTICES BURKE and FRIEND in passing on the petition. On the oral argument on rehearing they conceded the right of the justices to act but questioned the policy of acting.

Plaintiffs Altschuler, Melvoin and Glasser are, respectively, the wives of the three partners of Altschuler, Melvoin & Glasser, certified public accountants and the auditors for Essaness from 1931 to the filing of this suit, November 12, 1949. Plaintiff James Booth is an employee of Essaness and the husband of plaintiff Ruth G. Booth. Defendant and counterclaimant Stern is the wife of Emil Stern, an officer and stockholder of Essaness until 1945, and thereafter an executive of the corporation until January 1950. She admits the allegations of the complaint and by her counterclaim

74

seeks the same relief that plaintiffs ask. Defendant Velma Silverman is the wife of defendant Edwin Silverman, president and sole stockholder of Essaness. Defendant Blackman is vice-president and attorney for Essaness. Defendant Woods Amusement Corporation was organized to take title to the property involved herein and is wholly owned by Essaness.

The property in question is improved by a ten-story building which contains ground-floor stores, offices, and the Woods Theatre. July 31, 1942 The Association of Franciscan Fathers of the State of Illinois, hereinafter referred to as Franciscans, purchased the fee and the lessors' interest in outstanding leases. The next day, August 1, 1942, they leased the theatre portion of the building to the Woods Theatre Corporation, then owned by Sidney M. Spiegel, Jr., and Silverman, for fourteen months, expiring September 30, 1943. This lease was subsequently transferred to Spiegel and Velma Silverman, each having a one-half interest. They operated the theatre as a partnership. December 23, 1942 each sold a 12½ per cent interest in the lease and partnership to Emil Stern, who transferred the interest thus acquired to his wife December 31, 1942. April 2, 1943 a lease from May 1, 1943 to April 30, 1946 was executed. This lease was superseded by a lease dated April 26, 1943 for the same period. Each of these leases gave the lessor an option to terminate the lease upon 60 days' written notice should it require the premises for ecclesiastical purposes—a fact to be determined in its sole discretion. November 5, 1943 Spiegel transferred his 37½ per cent interest to plaintiffs herein in the following proportions: James Booth, 2 per cent; Ruth G. Booth, 5½ per cent; Glasser, 10 per cent; Melvoin, 10 per cent; and Altschuler, 10 per cent. Velma Silverman and Minnie Stern retained their respective interests of 37½ per cent and 25 per cent. These interests remained fixed during the trans-

actions under consideration. On the same day the lessees formed a partnership, known as "Woods Theatre, Not Incorporated," hereinafter called "Woods partnership," for the operation of the theatre. The capital consisted of the lessees' interest in the lease of April 26, 1943, and $5,000, contributed by the partners in proportion to their respective interests in the lease. The term of the partnership was "to and including April 30, 1946, or to such other date as the Woods Theatre lease may hereafter be extended." On the same day the partners entered into an agreement with Essaness whereby the latter agreed "to manage and supervise the operation of the Woods Theatre for and on behalf of second parties (partners) from the date hereof until April 30, 1946 (unless the lease should be sooner terminated) and during the term of any extension of the Woods Theatre lease," on the terms and conditions specified therein. At the time this suit was started Essaness was receiving $500 a week for its services. The annual income from the theatre rose from $167,473.94 for the year 1943 to a maximum of $302,431.86 in 1947. In 1948 the income was $232,831.51.

Two more leases between the Franciscans and the partners were executed. By the lease dated December 31, 1943, for a term beginning January 1, 1944 and ending April 30, 1949, the lessor reserved an option to terminate the lease on April 30th in 1946, 1947 or 1948 by giving written notice on October 31, 1945, 1946 or 1947 respectively, and by payment of designated sums of money should the lessor in its sole discretion determine that it required the premises for ecclesiastical purposes. By the second lease, dated December 30, 1944, for a term beginning January 1, 1945 and ending April 30, 1951, the lessor reserved an option to terminate the lease on April 30, 1947 by giving written notice on or before October 31, 1946 of its intention to terminate the lease and by paying $23,333.33, provided

lessees delivered up possession by April 30, 1947, and, to terminate the lease on April 30, 1948, 1949 or 1950 by giving written notice of intention so to terminate the lease on or before December 31, 1947, 1948 or 1949, respectively without payment of any money or other consideration and without a determination of the need of the premises for ecclesiastical purposes. The lessees paid a bonus to procure each of these leases.

Spiegel died in September 1944. Silverman acquired his stock in Essaness. In December 1945 he acquired the stock of Emil Stern. He became and remained the sole stockholder of Essaness. None of the partners of the Woods partnership took any part in the conduct of its business. The management of the partnership was left to Silverman and Stern, representing their respective wives, and Glasser, who acted for those who acquired the Spiegel interest. Glasser, a witness for plaintiffs, testified that he carried on all negotiations for the purchase of Spiegel's interest in the lease and former partnership after Silverman and Stern indicated they did not desire to purchase it; that until April 26, 1949 there had not been a meeting of the partners; that he, Stern and Silverman met many times and discussed partnership matters; that all negotiations for the partnership with the Franciscans and their agent Nash for a renewal or extension of the leases were carried on by Spiegel in his lifetime, and thereafter by Stern and Silverman; that prior to an extension of a lease he would discuss the terms of the extension with Silverman and Stern. Stern, called on behalf of his wife, hereinafter included in the appellation "plaintiffs," adds that he sat in with Spiegel on the various renewals of the lease, and after Spiegel's death carried on the negotiations; that he did not think Silverman ever negotiated independently of him for renewals of the lease; that he believed Silverman was acting for the partners in approving the lease of De-

77

cember 31, 1943. Plaintiffs allege that continuously since November 5, 1943, Essaness has been and now is managing and supervising the operation of the Woods Theatre on behalf of the partnership, and, among other things, negotiating for the theatre lease and renewals thereof. These allegations are admitted. Plaintiffs further allege that from 1945 to the latter part of 1948 the negotiations with the lessor for the renewal of the lease were carried on "for the partnership by Emil Stern, . . . an employee of Essaness and the husband of defendant Minnie Stern." They further allege that "in November 1948 Stern left Chicago for an extended stay in California. Prior to leaving he discussed the pending negotiations with Silverman and requested that in his absence Silverman in behalf of the partnership take over and follow up such negotiations with Nash for a renewal lease, to which request Silverman agreed." Stern went to California in the early part of November 1948. He returned to Chicago in January 1949 and remained about three weeks. He then went back to California where he stayed until April 4, 1949. Silverman negotiated with Nash for the renewal of the lease after April 30, 1951. January 21, 1949, Nash wrote Silverman that the "time was not ripe to make any suggestions regarding a lease." This letter was shown to Stern within five days of its receipt. About February 28, 1949, Silverman and Nash had a talk, when, as plaintiffs say in their brief, "Mr. Nash told Mr. Silverman flatly that no lease would be given on the property by the Franciscan Fathers; that they were interested solely in selling it and that he had been approached about the purchase by Mr. Ben Gold." On oral argument on rehearing plaintiffs admit that there is not the slightest suggestion in the record of any deviation by the Franciscans from that position. Silverman testified that he was positive he talked with Stern immediately after getting

this information from Nash; that it was their custom to talk freely on the telephone; that he saw Stern in Palm Springs, California on March 16, 1949; that he told Stern of his talk with Nash just prior to his (Silverman's) departure from Chicago and that Nash had told him there was no chance of securing an extension of this lease; that the Franciscans had decided to sell this property and had a pending transaction at the price of $1,700,000 from Mr. Ben Gold; that nothing could be discussed until the expiration of the time Gold had to complete the deal. Stern affirms Silverman's testimony that he (Silverman) informed Stern of the Franciscans' refusal to renew the lease. Stern testified that aside from the discussion in California in which Silverman stated that he had been informed that the Franciscans would not grant a renewal lease, he had not heard from Silverman before April 28th of any effort on Silverman's part to get a renewal; that Silverman told him in California that Leonard (of Balaban & Katz), Arthur Rubloff, Lurie and Jones were bidding for the building and fee; that he, Stern, definitely remembers that Silverman did not mention Gold; that he thought he mentioned to Glasser that the above named persons were trying to purchase the property; that neither he nor Glasser did anything with this information; that he does not think that he told the partners about Silverman's negotiations with Nash January 21, 1949. Notwithstanding the position taken by the Franciscans, Silverman made further efforts to get a new lease, and was advised by letter dated April 25, 1949 that the Franciscans would not renew or extend the lease.

Father Weir, Provincial of the Province of the Franciscan Fathers, Father Swoboda, Secretary of the Province and of Father Weir, and Father Thomas, who within a month after the purchase of the Woods property in July 1942 had been put in charge of plan-

ning a church and friary on the premises, were called as witnesses by the defendants. They testified that the Order purchased the Woods property intending to convert it into a church and monastery; that they are prohibited by the rules of the Order from retaining income producing property; that the Woods property was held until 1949 because they were not in a position, on account of the war and other conditions, to convert it into a church; that by the end of 1944 they had completed plans for the conversion of the building; that under these plans all tenants would have been evicted and the entire premises used for church and friary purposes; that in January or February 1949 they instructed Nash of the Real Estate Corporation, their Chicago agent, to sell the Woods property and procure a better location; that in 1949 they were not interested in any lease because they were determined to either convert the Woods property into a church or procure another place; that lease offers were made to them through Nash, and he was instructed to reject all of them; that they would not enter into a new lease or extension of a lease or grant a lease to anybody. In respect to their intentions Father Weir testified: "No, we were not interested in any lease whatsoever, because we were determined to either convert the Woods into a church or purchase another place, but definitely." Father Swoboda said that in January or February 1949 the Order had concluded "that if we would find the right kind of deal we were decided to sell the Woods and buy a better location or to go ahead with the remodeling of the Woods." Father Thomas, who was directly in charge of the conversion of the Woods Theatre, adds: "If we hadn't purchased the La Salle Theatre Building, we certainly would have gone ahead with the remodel (sic) of the Woods Building into a church and friary," and "We were getting rid of the building if we could get the new spot, and if not we were going ahead with that building immediately."

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■

■ Silverman testified that after he talked with Nash on February 28, 1949 and before leaving for California on March 9th, he instructed Blackman to investigate the mortgage possibilities of the property so that in the event the Ben Gold transaction did not materialize they could decide whether to make an offer; that around April 18th he was informed that the Gold deal had not gone through; that he then commenced negotiations for the purchase of the property. He instructed Blackman to make an offer of $1,200,000. Blackman testified that the first time he did any actual negotiating was around April 20th; that several weeks before, he began checking the value of the property and contacting insurance companies regarding a loan. There is no competent evidence contradicting this testimony. An unsuccessful attempt was made by plaintiffs to prove by the testimony of Arthur Rubloff, a real estate broker, that as early as 1946 Silverman was attempting to procure a lease of the theatre after April 30, 1951 for himself, and by the testimony of Stern that prior to the refusal of the Franciscans on February 28, 1949 to renew the lease, Silverman was discussing the purchase of the premises with Nash. Rubloff testified, after refreshing his recollection from a memorandum made by him, that he had a telephone conversation with Silverman on June 11, 1946; that it was generally known that the Woods building and fee were for sale and the Franciscans' agents were offering it around; that he had talked with the agents and was attempting to sell the property as a broker; that it was one of the situations where brokers find a piece of property is for sale, and if they get a buyer they go to the agent who has it for sale and say they can get a buyer and will split the commission if let in on the deal; that he called Silverman and told him the entire circumstances and that if it was to his advantage perhaps he, Rubloff, could work out a deal, and asked on what basis he, Silverman, would be interested; that

Silverman said he would be interested in a lease, after the 1951 expiration, for a period of 20 years at $100,-000; that if the deal were made he would make it himself, a new corporation would take over; he did not mention any particular interests; that he, Rubloff, did not know whether Silverman had in back of his mind the same interests or other interests, or himself, or what it was. Stern testified that on May 3, 1949 Nash told him that Silverman was talking about the deal in the early part of the year and that when he, Silverman, went to California he requested Nash to keep in touch with Blackman for the purpose of continuing the talks. This testimony is evidence only of the fact that Stern had the conversation detailed by him. It is not evidence of the truth of anything Nash may have said to Stern. *Hately v. Kiser,* 253 Ill. 288; *Bishop v. Georgeson,* 60 Ill. 484; Greenleaf on Evidence (15th ed.) sec. 124. Nash is in business in Chicago. He is not employed or controlled by defendants. His files were in the office of plaintiffs' counsel when Father Weir testified. If plaintiffs wished to prove the truth of the alleged statements by Nash as to Silverman's activities, they should have called Nash to testify.

Stern testified that around April 21st or 22nd Silverman told him that he was trying to purchase the Woods building and fee; that a lot of other people were trying to do the same thing; that Silverman cautioned him against saying anything to anybody, including his wife; that on April 25th, after a meeting with Silverman, Blackman and a representative of the New England Mutual Life Insurance Company, Stern suggested that Glasser be acquainted with what was going on, and Silverman asked Stern to reach Glasser. Glasser testified that pursuant to a message left at his home he called Silverman and talked with him over the phone about midnight on April 25th and was told that the Franciscans had some negotiations

for the sale of the property and "if we wanted to protect our interests we would be compelled to work out a deal and buy the property." The next morning Glasser, Stern, Silverman and Blackman had a conference in which the purchase of the property was discussed. Other meetings followed in which proposals and counterproposals were made and discussed.

Under date of April 25, 1949 Silverman signed an application for a loan of $750,000 on the property. April 26th Blackman sent to the Franciscans a form of contract of purchase by Essaness at a price of $1,200,000, of which $10,000 as earnest money was to be paid concurrently with the execution of the agreement, and the balance of $1,190,000 on delivery of deed. If the purchaser defaulted the earnest money was to be forfeited as liquidated damages. In addition Essaness was to pay Nash $50,000 commission in yearly instalments of $10,000. The transaction was closed through an escrow agreement dated June 30, 1949. The property was conveyed to Woods Amusement Corporation by deed dated June 29, 1949. A mortgage of $750,000 dated June 30, 1949 to the New England Mutual Life Insurance Company was executed by the purchaser. The indebtedness secured thereby was guaranteed by Essaness. Pending the completion of the transaction Stern and Glasser sought to interest two investors of financial means and a well known real estate operator in taking over the purchase of the property and giving a lease of the theatre to the partnership. Silverman consented to these efforts. They failed. At no time did the partnership offer to take over the purchase. Glasser testified that the partnership could not pay the $450,000 paid by Essaness over and above the proceeds of the mortgage. This mortgage could not have been obtained without the guarantee of Essaness. Plaintiffs objected to an agreement whereby the profits of the operation of the

theatre should be applied to the repayment of the moneys advanced by Essaness in the purchase of the property and in payment of the mortgage guaranteed by Essaness.

█ Plaintiffs' action is based on an alleged destruction of the partnership expectancy of the renewal or extension of the theatre lease by the purchase of the property in which the theatre is located, in violation of the duty of Essaness and Silverman as agents of the Woods partnership. It is unquestionably the law that a managing agent such as Essaness, or an agent expressly charged with procuring the renewal or extension of the lease, could not negotiate for a lease for his own benefit so long as the principal has a right or expectancy of renewal of the lease. *Davis v. Hamlin*, 108 Ill. 39. The reason for the rule ceases when the right or expectancy is extinguished, without deception or fraud by the agent, by the refusal of the landlord to renew or extend the lease to the tenant. The principle is clearly stated in *Crittenden & Cowler Co. v. Cowler*, 66 App. Div. 95, 72 N. Y. Supp. 701. The corporation was in possession under an assignment of a lease. The landlord had refused to accept it as a tenant and refused to renew the lease to it. A lease was given to a director. The court refused to hold that the director held the lease in trust for the use of the corporation, and said:

"Here there was no secret leasing, no act done 'behind the back.' Here we have a positive refusal on the part of the landlord to accept the corporation as a tenant. This refusal, after application made and considered, disposed of and cut off that 'expectancy' which is declared by some authorities to run with every lease, —the expectancy of a renewal. . . . *But the rule ceases to operate when such expectancy no longer exists.* It will hardly be claimed that a landlord may

84

not exercise his own discretion in the selection of a tenant. He may or may not renew, as he chooses. *When once he has declared against renewal, the tenant, then in occupation, has no more an expectancy which can be dealt with. Whoever thereafter leases does the tenant no injury, and takes from him no property or property rights.* I see no reason in law or equity in excluding a co-partner or a director in a corporation from dealing with the landlord in respect to the premises after a renewal to the occupying tenant has been refused by the landlord.'' (Emphasis added.)

In *Poy v. Allan,* 231 Mich. 472, the landlord refused to lease to a tenant and thereafter leased to an agent of the tenant. In denying relief to the tenant the court said:

''The offer was rejected finally and absolutely and the rejection was in no way affected by fraud or collusion of defendants or any of them. . . .

The promptness of Allan in applying for lease after his clients' offer had been rejected doubtless made them suspicious and gave color of merit to their claims. But the Boyntons had the undoubted right to refuse plaintiffs' offer. The reason for refusal need not be stated. *But being refused finally, and such refusal being free from fraud or other infirmity, plaintiffs were not concerned in the lease subsequently made.''* (Emphasis added.)

To the same effect are *Washer v. Seager,* 272 App. Div. 297, 71 N. Y. S. (2d) 46; *Davis v. Pearce,* C. C. A. 8th Cir., 30 F. (2d) 85; *Robinson v. Eagle-Picher Lead Co.,* 132 Kan. 860.

██ ██ In the instant case the refusal of the Franciscans on February 28, 1949 to renew or extend the lease was final. That refusal was never deviated from. The decision to refuse renewal or extension of the

lease was based on consideration of matters affecting the interests and policy of the Order and applied not only to the theatre portion of the building but to the entire property. The honesty of the decision and its freedom from fraud or other infirmity cannot be questioned. There is, therefore, no basis for a charge of deception or fraud against defendants. There was no concealment of the refusal from plaintiffs. Stern, an agent of the partnership in negotiating a renewal of the lease, admits that he was informed by Silverman not later than March 16, 1949 that the Franciscans would not grant a renewal lease. The chancellor, who heard and saw the witnesses, found specifically that defendants made a full and complete disclosure to the partnership of all facts and matters pertaining to the negotiations for the extension of the lease and at all times used their best efforts to obtain a renewal or extension beyond April 30, 1951. These findings are not against the manifest weight of the evidence. They should not be set aside. *Flynn v. Troesch,* 373 Ill. 275; *Cravens v. Hubble,* 375 Ill. 51; *Chmiel v. Chmiel,* 399 Ill. 91. In each of the cases dealing with the rights and obligations of a fiduciary of a lessee, cited above, the fiduciary obtained a lease of the premises occupied by his principal. Here the fiduciary of the tenant purchased the premises and became the landlord of his principal. There is nothing in the record to indicate any agency or fiduciary relation of defendants in respect to the purchase of the property. Whatever rights plaintiffs have are derived from their membership in the partnership. The most they can claim is the rights of the partnership. It was organized only to operate the theatre until the expiration of the then-existing lease, its renewals and extensions, if any. No provision was made to continue it beyond that time. The scope of the partnership was never extended. The right of the partnership being limited to an expectancy

of renewal of the lease, the defendants breached no duty when they purchased the building and fee.

*Thanos v. Thanos,* 313 Ill. 499, was a suit for dissolution of a partnership and an accounting. The business of the partnership was buying, selling and operating restaurants in Chicago. The firm operated a restaurant in leased premises at 3905 Cottage Grove avenue. The defendant bought the property with his own funds and took title in his own name. The plaintiff claimed the property as a partnership asset. The court said: "The evidence shows that this property was not bought with partnership funds, but that the purchase price was paid by appellant from private funds which had been set aside to him as his share of the profits from the partnership business. While the lease on this building and the right of the partnership to renew the same are partnership assets, this does not affect the right of appellant to secure and hold as his individual property the fee to the premises. The mere fact that appellant and appellee were partners in the restaurant business did not make real estate purchased by one of them partnership property."

This case was cited with approval in *Lipinski v. Lipinski,* 227 Minn. 511, where the parties were engaged in a wholesale fishing enterprise. They leased certain land on the shore of a lake. Adjacent to this land was a small tract which they also used in their operations. A partner bought this tract with his own funds and took title in his own name and his wife's. The court held that the parties stood in the relation of fiduciaries to each other but denied plaintiffs' claim that the tract was held in trust for the partnership or joint enterprise. In respect to the agreement of the parties the court stated:

"We can find nothing in this agreement to indicate that the acquisition of additional real estate was one of the objects or purposes of the business. . . . The

87

undertaking involved was definitely that of a fishing enterprise and not one involving the acquisition, improvement, or development of real estate. It was limited to four years, and there was no provision for any renewal.''

After considering several authorities, the court said:

''Consequently, it has been held that, while a lease held by a partnership and the right to renew it are partnership assets, the title of a landlord is not so adverse to that of his tenant as to prevent a partner from purchasing the fee to the premises which the partnership leased, provided he practices no fraud or deception upon his copartners and holds his fee subject to the lease for the duration thereof. *Thanos v. Thanos,* 313 Ill. 499, 145 N. E. 250; *Sonek v. Hill B. & L. Assn.,* 138 N. J. Eq. 108, 52 A. (2d) 852; *Anderson v. Lemon,* 8 N. Y. 236, affirming 4 N. Y. Sup. Ct. (Sandf.) 552.''

In opposition to these cases plaintiffs cite *Meinhard v. Salmon,* 249 N. Y. 458. The parties were co-lessees. Before the expiration of the lease the defendant *secretly* obtained a lease of the demised premises and contiguous property for a long term, commencing on the expiration of the existing lease, and excluded plaintiff from participation in the new endeavor. The court held that in respect to the new lease the defendant stood in a fiduciary relation to plaintiff. If the case be construed as holding that a partner or agent cannot purchase the fee in property under lease to the partnership or principal, it is in conflict with *Thanos v. Thanos, supra,* which must control our decision. Moreover, relief was granted in the *Meinhard* case because defendant secretly negotiated with the landlord for a new lease before the expectancy of renewal of the existing lease had been extinguished. That vice is not present

88

here. The Woods partnership expectancy of renewal was extinguished February 28, 1949. From that time the defendants were free to negotiate independently of the partnership, through which plaintiffs must derive whatever rights they have in respect to the property involved herein. The trial court found, and we find, that defendants acted in good faith in endeavoring to procure a renewal and extension of the lease, and that plaintiffs through their agent Stern were at all times fully advised as to the negotiations, including the definite refusal of the Franciscans on February 28th, 1949.

The chancellor did not err in dismissing the complaint and counterclaim for want of equity.

 Plaintiffs object to the participation of the newly appointed justices in the consideration of the petition for rehearing. Although the question is no longer important in this case, we have given it careful consideration. We start with certain general propositions of law. Where a petition for rehearing is filed, the judgment of the Appellate Court does not become final until the petition is denied. (Rule 32 of the Supreme Court.) The power to vacate a judgment during term is inherent in all courts, appellate and *nisi prius*. *Marshall Field & Co. v. Nyman*, 285 Ill. 306, *Brant v. Chicago & Alton R. Co.*, 294 Ill. 606. The orders entered are the orders of the court and not the judge. The court remains the same notwithstanding a change in the incumbent judges, and such a change cannot and ought not to endanger the rights of litigant parties. 30 Am. Jur., Judges, sec. 38. If the successor judges are to be barred from considering the petition on its merits, defendants will be denied consideration of their application for a rehearing. Because a quorum will be lacking the petition will have to be denied. It can be granted only by the vote of two judges. *Metropolitan Water Dist. v. Adams*, 19 Cal. (2d) 463; *Flaska v.*

*State,* 51 N. M. 13. Plaintiffs' suggestion that the Supreme Court be requested to assign to this division, to pass on the petition, the justices constituting a majority of this court when the opinion was filed, is not a solution. The power of the Supreme Court in respect to assignments to the Appellate Courts is purely statutory. The court is authorized to appoint judges for a full term, an unexpired term in the event of a vacancy, and to make temporary assignments in case a judge of the Appellate Court is temporarily incapacitated, from sickness or otherwise. There is no provision for temporary assignments or a transfer of judges from one branch court to another for the purpose of hearing or determining a particular case or some motion in the case.

 No relevant Illinois cases are cited in support of plaintiffs' position. *Garrett v. Peirce,* 84 Ill. App. 31. is not in point. The case was before the Appellate Court three times. On the first appeal (65 Ill. App. 682) the Appellate Court sustained the complaint. On the second appeal (74 Ill. App. 225) the court held that it should not treat the legal propositions announced on the first appeal as open to further consideration in the same case. This ruling is in accord with a long line of decisions based in part on section 17 of the Appellate Court Act then in force, making the first opinion a binding authority in the case. (*Gillum v. Central Ill. Pub. Serv. Co.,* 250 Ill. App. 617.) On the third appeal the binding effect of the first decision was again upheld. There had been a change in the membership of the Appellate Court and JUSTICE DIBELL, who wrote the opinion on the second and third appeals, said: "As an ordinary rule a mere change in the membership of an appellate tribunal ought not to reopen in the same case questions once settled by it." With this statement there is no quarrel. A mere change in the membership of a court should not open for reargument any

90

issue previously settled by the court. That question is not involved here. In the *Garrett* case the court was considering the right to reargue questions settled by a final judgment several years after the judgment became final. Here the opinion, filed June 18, 1951, was not a final adjudication and could not be until the petition for rehearing was disposed of. (Rule 32, Supreme Court.) The petition was filed within the time fixed by the rules, as extended by an order of the court. This was after the assignment of the new justices. Consideration of the petition and the entry of an order granting or denying the rehearing was a necessary step to be taken by the court before the case could be finally disposed of. The question whether the rehearing should be granted on the grounds stated in the petition was a question separate from and independent of the question of the prior announcement of decision in the opinion. *Metropolitan Water Dist. v. Adams, supra.* The petition was first considered by the court as now constituted, and its order granting a rehearing is the first and only determination of that question. After familiarizing themselves with the record and briefs in the case, the newly appointed justices were presumably as capable of determining the questions involved on the petition for rehearing as the justices who participated in the consideration of the case leading to the opinion filed. The predecessor and successor judges might differ as to the order to be entered, but who can say the former judges would have denied a rehearing had the question been submitted to them. Litigants are entitled to a determination of their case by a legally constituted court—not by particular justices.

The foreign cases cited are not harmonious. Each case defines the practice of its jurisdiction. The rule stated in *Brown v. Aspden,* 14 How. Rep. 25 (55 U. S.), and *Ambler v. Whipple,* 23 Wall. Rep. 278 (90 U. S.),

that no rehearing will be granted in any case unless a member of the court who concurred in the judgment desires it, is practical in federal jurisdictions, where the judges are appointed for life and new judges come to the court singly and at irregular intervals. It is impractical in Illinois where five of the seven judges of the Supreme Court may be replaced at an election every nine years and where the entire membership of the Appellate Courts is subject to change every three years. If the federal rule were adopted in Illinois a change in the majority of the court might deny a defeated party the right to a rehearing. The possibility of that change is demonstrated by the June 1951 election when three new judges were elected, with a fourth judge the successor to Mr. Justice Wilson, deceased, by appointment several months before the election. Moreover, the federal cases do not hold that new judges cannot pass on petitions for rehearing. In the *Ambler* case Mr. Justice Miller said:

"It is the well-settled rule of this court, to which it has steadily adhered, that no rehearing is granted unless some member of the court who concurred in the judgment, expresses a desire for it, and *not then unless the proposition receives the support of a majority of the court.*" (Emphasis added.)

He did not say a majority of the judges participating in the decision. The "majority of the court" necessarily meant the majority of the court as constituted when the petition for rehearing is to be decided. In *Metropolitan Water Dist. v. Adams, supra,* where the court sustained the right of a member of the court who did not participate in the decision of the case to pass on a petition for rehearing, the court quoted from *Luco v. De Toro,* 88 Cal. 26, as follows:

"The rule has always been, with respect to petitions for rehearings, that as many justices as are necessary

92

to pronounce the judgment must concur in granting a rehearing, or the petition will be denied,"

and added:

"It is significant that the phrase 'as many justices,' and not, 'as many of the justices who were present at the argument,' was used."

In *Peoples v. Evening News Assn.,* 51 Mich. 11, and *McCutcheon, Admr. v. Common Council of the Village of Homer,* 43 Mich. 483, the question presented here was not decided. In the first case, in a *per curiam* opinion, the court said:

"Held, unanimously, that a rehearing will not be ordered on the ground *merely* that a change of members of the bench has either taken place or is about to occur." (Emphasis added.)

In the second case a party endeavored to have the court re-examine its decision in *City of Detroit v. Blackeby,* 21 Mich. 84, and permit a reargument of that case many terms of court after the decision had been rendered. In *People v. Mayor, etc., of New York,* 25 Wend. 252, an opinion by a divided court was filed December 28, 1840; a motion for reargument on the merits, presented February 2, 1841, after a change in the members of the court and *after final judgment* was denied. The court held that the judgment was settled at the December term and was final, nothing remaining to be done except for the attorney to get a copy of the record of judgment and file it in the Supreme Court, which he had a right to do without further action of the reviewing court, and that the "court has no legal right to grant a rehearing upon a writ of error, after a final judgment has been pronounced here upon the merits of the case, and has been regularly settled and entered of record, in the form required by law." The only reference to the new members of the court was

in the statement that it was inexpedient to grant a rehearing upon a change of the members *"for the purpose of producing a different decision of their causes by the votes of new members. . . .* For if this court on a writ of error can open and reverse its decision upon the merits *at a subsequent term,* inferior courts may do the same thing." (Emphasis added.) In *Golden Valley County v. Greengard,* 69 N. D. 171, a petition for rehearing was filed after one of the judges concurring in the majority opinion had retired from office. The court said:

*"The mere fact that there has been a change in the membership of the court* does not afford any reason for a rehearing. *Carol v. New York L. Ins. Co.,* 49 N. D. 813, 814."* (Emphasis added.)

In the *Carol* case a petition for rehearing was denied after change in membership of the court, *the new judges participating in the consideration of the petition and the decision thereon.*

*Woodbury v. Dorman,* 15 Minn. (Gil.) 274, *Gas Products Co. v. Rankin,* 63 Mont. 372, *Cordner v. Cordner,* 91 Utah 474, 64 P. (2d) 828, and *Flaska v. State,* 51 N. M. 13, support plaintiffs' contention that successor judges should not act on a petition for rehearing of a case decided during the incumbency of their predecessors. These decisions are based on grounds of expediency: that a change of a decision (not final) by the votes of successor judges would tend to destroy respect for and confidence in the courts. *Woodbury v. Dorman* clearly states the theory of these decisions and exposes its weakness. After stating that there is not the slightest reason to suppose that the decision would be changed if the court were constituted as it was when the decision was rendered, and that if re-argument were allowed and the decision reversed the result would follow, not "from the consideration of

94

reasons and arguments not before advanced and considered, but solely from the change in the composition of the court," and that a relaxation of the ordinary rules governing applications for reargument would be a violation of proprieties in the administration of justice and tend to destroy respect for and confidence in judicial tribunals (citing *People v. Mayor, etc., of New York,* 25 Wend. 252), the court said:

"The application for the reargument must therefore be denied. To prevent any misapprehension of the effect of the denial, the chief justice and myself deem it proper to say, however, that with the highest respect for the able and learned chief justice who pronounced the prevailing opinion in this case, as well as for our brother McMillan, who concurred with him, we believe the decision to be erroneous in respect to the validity of the mortgage. And, in view of the disastrous consequences which in our opinion may result from what we conceive to be a mistaken rule of real property, we deem it proper to add that we should not feel bound, in any future case which might come before the court, to follow the decision, but should feel at entire liberty to re-examine the question involved as *res nova,* and to overrule the decision, if our present views should remain unchanged."

Surely it would have been better for the court, the litigants and the business interests of the State, if the court had re-examined the question involved as to the validity of the mortgage as *res nova.* Its decision then would have rested on the sound judgment and conviction of the court and not on judicial courtesy.

In *Flaska v. State, supra,* the case was decided by a divided court, 3–2, and a petition for rehearing denied by the same division of the court. After the appointment of a successor of a judge of the majority a second petition for rehearing was filed, posing no ques-

tion not submitted and disposed of in the decision on the first petition. The right of the new judge to participate was denied, and, the court standing 2–2, the petition was denied. The court relied on *Cordner v. Cordner, supra, People v. Mayor of New York, supra, McCutcheon, Admr. v. Common Council of the Village of Homer, supra,* and *Woodbury v. Dorman, supra.* It rejected *Metropolitan Water Dist. v. Adams, supra.* Plaintiffs dismiss the latter case as "dictated by the rules of practice of California." We find nothing in the case making it inapplicable to Illinois or inconsistent with Illinois precedents. The case was decided by a divided court; 4–3. JUSTICE PULLEN of the Appellate Court, having been assigned temporarily to the court in the absence of JUSTICE HOUSER, heard the argument and concurred in the majority opinion. A rehearing was allowed on an order signed by the three dissenting justices and JUSTICE HOUSER. Before the decision on the petition defendants objected to JUSTICE HOUSER and contended that JUSTICE PULLEN should sit on the disposition of the petition. A later motion to set aside the order granting a rehearing was made and denied. The assignment of JUSTICE PULLEN *pro tempore* was from April 1st to May 15, 1941, and "thereafter to act as such until all matters submitted" to him "therein shall have been disposed of by him." With respect to this assignment the court said:

"But the application for a rehearing had never been submitted to him. The matter of the pronouncement of judgment had been submitted to him and he had acted on the matter so submitted. *But the question whether the judgment should be set aside and further consideration be given to the appeal in accordance with the showing made by the plaintiff district in its petition for a rehearing was a question separate from and independent of the question of the prior pronouncement of judgment.* The question whether a

96

rehearing should be granted was, as above stated, presented to the court with its regular membership participating, and JUSTICE HOUSER had the power to act on the matter unless disqualified. No disqualification, constitutional, statutory or otherwise, has been shown." (Emphasis added.)

After discussing prior California cases, including *Luco v. De Toro,* 88 Cal. 26, heretofore referred to, the court said:

"The matter of setting aside the submission of the cause has always been considered as one requiring court action, and the vote of four of the justices constituting the court at the time the order is made as necessary to its effectiveness. This is the uniform practice. It is safe to say that no order setting aside a submission has otherwise heretofore been made. The parties, of course, have the constitutional right to a judgment herein by a duly constituted court, but *they have no right, constitutional or otherwise, to a decision by any particular judge or group of judges."* (Emphasis added.)

In respect to cases in foreign jurisdictions, the court said:

"There is nothing in the cases in other jurisdictions, relied upon by the defendants, that is controlling. They cite cases following the practice in the United States Supreme Court to the effect that no rehearing will be granted unless a member of the court concurring in the majority opinion desires such reconsideration. That rule is one of judicial policy and works no compulsion on courts of other jurisdictions to adopt it, and involves no fundamental rights. Cases in other states, such as *Cordner v. Cordner,* 91 Utah 474 (64 Pac. (2d) 828; *Woodbury v. Dorman,* 15 Minn. (Gil. 274) 341; and *Gas Products v. Rankin,* 63 Mont. 372 (207 Pac. 993, 24 A. L. R. 294), also cited by the defendants, like-

wise reflect policies in state practice with which we are not here concerned, at least to the extent that they should be adopted in preference to a practice in this state under which the courts and litigants have proceeded with apparent general satisfaction."

We have quoted extensively from this decision because it is consistent with Illinois practice. We find no reported Illinois case in which the question presented by plaintiffs has been decided. However, in at least two cases newly elected justices of the Supreme Court have participated in the disposition of petitions for rehearing of cases in which the opinion had been filed prior to their election and qualification. In *Lees v. Chicago & N. W. Ry. Co.*, 409 Ill. 536 (Advance Sheets, October 10, 1951), the opinion of the court, written by MR. JUSTICE GUNN, was filed May 24, 1951. Neither he nor MR. JUSTICE THOMPSON were candidates for re-election on June 4, 1951. A petition for rehearing was denied September 20, 1951, and their successors were noted as dissenting from the opinion filed. In *People ex rel. Lawrence v. Village of Oak Park*, 356 Ill. 154, the first opinion, concurred in by all of the justices of the court except JUSTICE DEYOUNG who dissented, was filed prior to the qualification of the judges elected in June 1933. JUSTICE DEYOUNG was re-elected. Three new justices were elected. They participated in the decision granting a rehearing October 4, 1933 on petition filed July 11, 1933. Only three of the justices concurring in the opinion were then members of the court. Undoubtedly there are other cases. The action of the newly elected judges in these cases is consistent with the practice in the trial courts, approved by the Supreme Court.

A motion for a new trial and a petition for rehearing are akin. The determination of each requires an examination of the proceedings theretofore had in the court in which the motion or petition is filed. On a motion for new trial the rulings of the trial judge on

evidence, instructions and the conduct of counsel, as well as other matters, may be reviewed. On petitions for rehearing the record is examined to ascertain whether or not in the opinion filed the court has overlooked or misapprehended matters material to the decision. The power and duty of successor judges in disposing of motion or petition should be the same. Independent of any statute, the successor judge in the trial court has the power and it is his duty to pass on a motion for a new trial of a case tried before another judge. In *People ex rel. Hambel v. McConnell,* 155 Ill. 192, 201, the court said:

". . . we are of opinion that under the modern practice in our courts the better rule, and the one sustained by perhaps the weight of more recent authority, is, that the succeeding judge, presiding in the same court, has power to decide a motion for a new trial, and to grant or overrule the same, and enter such judgment or order as shall to justice appertain. (Citing cases.) The court is required to pass upon and determine the motion for a new trial. *The determination is a judicial one, to be made by the court and not by the particular judge who may, at a particular time, have presided therein."* (Emphasis added.)

See also *People v. Ficke,* 343 Ill. 367, 387. The power and duty of a trial judge to re-examine and correct what he deems to be erroneous rulings of his predecessor is firmly established. In *Fort Dearborn Lodge v. Klein,* 115 Ill. 177, 181, the court said:

". . . we are of opinion that under the present liberal practice, the court has the power, and that it is its duty at any time before trial, when it becomes satisfied that an erroneous ruling has been made with respect to the sufficiency of a pleading, or other similar matter, to promptly set aside the order and correct the error. . . . The fact that the order was made by another

99

judge is a matter of no consequence whatever. The power of the trial judge was precisely the same as if he had made the ruling himself. The ruling in either case would be the act of the court.''

See also *Dowie v. Priddle*, 216 Ill. 553, *Shaw v. Dorris*, 290 Ill. 196, 204, where the judge acted on his own motion, and *Roach v. Village of Winnetka*, 366 Ill. 578.
██ The position taken by plaintiffs on the argument on rehearing, namely, that the successor justices had the right or power to take part in the decision on the petition for rehearing, but that it was not good policy to do so, makes the questions raised by them academic. The decision of this court on the merits of the controversy will be judged on appeal, if any is taken, on its merits. In *Marshall Field & Co. v. Nyman*, *supra*, the court had under consideration the right of a branch Appellate Court to overrule and vacate an order entered by the main court. The main court had denied a motion to strike a stenographic report. It then assigned the case to the first branch of the court, where the motion to strike was renewed. The court allowed the motion and affirmed the judgment. For the purposes of review the Supreme Court assumed that the motions were identical and the record the same on both motions. It said:

''. . . while we are clearly of the opinion that it is not good practice nor in consonance with orderly procedure, after an order is duly entered by one branch of the Appellate Court for another branch to overrule or set aside such order, we are disposed to hold that the court, under circumstances as presented in this record, was not without power to enter the order entered here.''

The Supreme Court then examined the ruling of the branch court on its merits and affirmed its action in

100

striking the stenographic record. In the instant case the court was not passing on a question previously determined by other judges or another branch of the court. Under the Illinois decisions and precedents the successor judges exercised a right and performed a duty in passing on the petition of defendants for a rehearing. No policy or proprieties were violated. The conclusion we have reached makes it unnecessary to determine whether or not plaintiffs have waived their objections by not raising any question as to who should pass on the petition until after a ruling by the court.

The decree appealed from is affirmed.

*Affirmed.*

BURKE, P. J., concurs.

FRIEND, J., dissents.

MR. JUSTICE FRIEND DISSENTS.

I dissent.both (1) from the procedure adopted by the majority of the court in granting the petition for rehearing through participation of a new member of the court, and (2) from the conclusions of the majority upon the merits of the case.

1. The petition for rehearing was filed after the re-assignment of JUDGES TUOHY and FEINBERG to other divisions of the Appellate Court on June 18, 1951. There remained of the former members of the division as of that date only one justice, JUDGE NIEMEYER, who had filed a dissenting opinion. JUDGE BURKE and I, who were assigned to sit with JUDGE NIEMEYER as the reconstituted division,' had been members of the third and second divisions, respectively, and took no part whatever in the original consideration or decision of the case. When the petition came up for disposition in executive session on September 17, 1951, I dissented from the order granting the petition because it seemed to me that the establishment of such a precedent, under the prevailing circumstances, was fraught with danger

101

and might well have mischievous and unfortunate results; it would, upon 'change of a part of the court, present the temptation to parties who had judgments against them by a divided court to seek a rehearing for the purpose of producing a different decision by the votes of new members who had not in any way participated in the original appeal. That is precisely what occurred in this proceeding, with the result that the former dissenting opinion has now, through participation of one of the new members, become the majority opinion, operating as a review and reversal by the present court of the decision of the court as previously constituted, which had decided the appeal after full hearing and careful consideration. It is well known, of course, that the Appellate Court in this district is, for purposes of convenience, divided into three separate divisions, all housed on one floor of the building which they occupy, and that JUDGES TUOHY and FEINBERG were and presently are readily available so that, pursuant to a temporary reassignment order of the Supreme Court, they could review their own decision and pass upon the petition for rehearing. It was and still is my contention that the unusual situation presented should have been resolved either by denying the petition or by referring the matter to the Supreme Court with the request that the first division be reconstituted for the sole purpose of disposing of the petition.

After the petition was allowed, plaintiffs filed their answer with supporting authorities, in the forepart of which they cited and discussed numerous decisions in various jurisdictions holding that upon basic principles underlying orderly judicial administration, new members of the court should, as a matter of propriety, refrain from considering a petition for rehearing where they had taken no part in the decision of the cause. The case was then reargued and the question under

consideration was fully presented by plaintiffs' counsel. Although defendants had ample time to study the answer and consider the cases cited by plaintiffs, they presented no authorities to the contrary but took the position that the question was moot. If the question was moot it was rendered so by the order of the court allowing the petition, and since the sole question then being considered was whether the order had been improvidently entered, the court could in good conscience still have reconsidered its allowance of the petition and vacated the order. The defense of the order allowing the petition through participation of a new judge is not and was not made by defendants, but by the court. Therefore, in stating my views, frequent reference will of necessity be made to the majority opinion rather than to defendants' contentions.

The functions of a petition for rehearing are well understood by bench and bar, and the fundamental principles governing the attitude of courts toward rehearings and rearguments are well established. Most reviewing courts prescribe the conditions under which a rehearing may be sought. In this district Rule 13 of the Appellate Court provides that the petition "shall state concisely the points supposed to have been overlooked or misapprehended by the court" and that "in no case will any argument be permitted in support of such petition." The paradox is self-evident in procedure which calls upon two new judges of a court of three to consider points supposed to have been overlooked or misapprehended by them in a decision in which they had no part. The impropriety of considering a petition for rehearing by a newly constituted court was early recognized by CHIEF JUSTICE TANEY in *Brown v. Aspden*, 55 U. S. 25 (1853). In passing upon a motion for rehearing he announced the rule of the court that no reargument would be heard in any case

after judgment unless some member of the court who concurred in the judgment afterwards doubted the correctness of his opinion and desired further argument. The rule was re-enunciated in *Ambler v. Whipple,* 90 U. S. 278 (1874), and has been adhered to since. There is implicit in these early decisions the sound conclusion of the court that the only office of the petition is to call to the attention of the *majority* the point supposed to have been overlooked or misapprehended by them in their decision and not to open up the case for reconsideration and redecision; and of course there was in this instance no majority nor, in fact, any member of the majority, of the court to whom a petition for rehearing could be properly addressed.

I have carefully studied the decisions presented by plaintiffs in their answer to the petition, as well as those cited in the majority opinion, and comments therein on plaintiffs' authorities. With the exception of *Metropolitan Water District v. Adams,* 19 Cal. (2d) 462, 122 P. (2d) 257 (1942) (following an earlier decision in that state, *Luco v. DeToro,* 88 Cal. 26, 25 Pac. 983), wherein the court merely held that in the absence of any constitutional or statutory restrictions it had the "power" or right to grant rehearings without considering the propriety of doing so, I find no case in any jurisdiction, State or Federal, which, upon similar facts, sanctions the procedure allowed in the case before us. The authorities are almost unanimously to the contrary.

The precise question arose in *Cordner v. Cordner,* 91 Utah 474, 64 P. (2d) 828 (1937), wherein three members of the court concurred in the majority opinion and two members dissented. A petition for rehearing was filed. In the meantime one of the majority judges retired and a new member was appointed to his position. After a full consideration of the matter and review of the cases of other jurisdictions, the court

104

unanimously concluded that the new member should not participate upon the question of a petition for rehearing, and said: "For the new member of the court to participate would require that he consider the case on its merits and if, after considering the case, he should be compelled to disagree with the conclusion reached by a majority of the court as constituted at the time the decision was rendered, the ultimate effect would be to reverse the decision made. This question has not heretofore been squarely presented to this court. The effect of the participation of a new member of the court, where the court is evenly divided on the question after the retirement of the former member, would establish a precedent fraught with dangerous implications. The principles underlying the proposition involved and controlling the court's conclusion as to this matter have been long and well established by the courts of other jurisdictions." (Citing and quoting from *Brown v. Aspden's Administrators,* 14 How. 25, 55 U. S. 25, 14 L. Ed. 311, *Ambler v. Whipple,* 23 Wall. 278, 90 U. S. 278, 23 L. Ed. 127, *People v. Evening News Ass'n.,* 51 Mich. 11, 16 N. W. 185, *People v. Mayor of New York,* 25 Wend. (N. Y.) 252, 35 Am. Dec. 669, *McCutcheon, Adm'r. v. Common Council of the Village of Homer,* 43 Mich. 483, 5 N. W. 668, 38 Am. Rep. 212, *Gas Products Co. v. Rankin,* 63 Mont. 372, 207 Pac. 993, 24 A. L. R. 294, *Woodbury v. Dorman,* 15 Minn. 341 (Gil. 274), some of which will hereinafter be more fully discussed.)

Following *Cordner v. Cordner,* the Supreme Court of New Mexico in *Flaska v. State,* 51 N. M. 13, 177 P. (2d) 174 (1946, 1947) considered the identical problem of passing upon a petition for rehearing when there had been a change in the court personnel after an initial decision by a divided court. Originally three judges had concurred in the majority opinion and two had dissented. There were two motions for rehearing.

By the time the second motion was filed one of the judges who had concurred in the majority opinion had retired and a successor had been appointed. Because the question was also one of first impression in that state extensive consideration was given to the *propriety* of participation by the successor in passing upon the second application for rehearing. After a full and careful consideration of the numerous decisions in other jurisdictions the court decided that the new member should not participate upon the question for rehearing. Because the reasons for the decision of the court are so forcefully stated and precisely applicable to the question here involved, I quote at length from the opinion: ''We think the weight of authority, and the better reasoning, supports the conclusion that a judge who takes his place upon a court by succeeding a former judge thereof after said court, as so previously constituted, has rendered judgment and has denied rehearing in a case, cannot *with propriety* participate in the consideration and determination of a further motion for rehearing in such decided case. A number of authorities to this effect are collected and cited in the cases of *Cordner v. Cordner,* 91 Utah 474, 64 P. (2d) 828, and *Gas Products Co. v. Rankin,* 63 Mont. 372, 207 Pac. 993, 24 A. L. R. 294, wherein the Supreme Courts of Utah and Montana each arrive at the same conclusions on the proposition. If it may be said that the case of *Metropolitan Water District, etc. v. Adams,* 19 Cal. (2d) 463, 122 P. (2d) 257 (a case decided upon complicated facts and impressed by practice rules of California), announces another conclusion, we are not in accord with it. (Emphasis ours.) The *Cordner* case, *supra,* on its facts is on all fours with the case before this court, except that there the first petition for rehearing was involved, and quotation from it, including quotations therein given, is appropriate: '. . . The effect of the participation of a new member

106

of the court, where the court is evenly divided on the question after the retirement of the former member, would establish a precedent fraught with dangerous implications. . . .' *People v. Mayor, etc., of City of New York*, 25 Wend. (N. Y.) 252, 35 Am. Dec. 669. 'It would be mischievous in a high degree to permit the re-opening of controversies every time a new judge takes his place in the court, thereby encouraging speculation as to the probable effect of such changes upon principles previously declared and enforced in decided cases.' *McCutcheon, Admr. v. Homer*, 43 Mich. 483, 5 N. W. 668, 38 Am. Rep. 212. *'If a reargument were now allowed, and the former decision reversed, this result would follow, not from a conviction upon the part of the members of the court by which the case was originally heard and determined that the decision was erroneous, nor from the consideration of reasons and arguments not before advanced and considered, but solely from the change in the composition of the court.* Under such circumstances, a relaxation of the ordinary rules governing applications for re-argument, would seem to be peculiarly ill-timed. It would, in our opinion, be a *violation of proprieties* in the administration of justice, which it is the duty of a court to maintain, and would tend to destroy that respect for, and confidence in judicial tribunals, the loss of which every good citizen would deplore.' *Woodbury v. Dorman,* 15 Minn. 341, Gil. 274. With the principles thus announced we agree.'' (Italics supplied.)

In *Gas Products Co. v. Rankin*, 63 Mont. 372, 207 Pac. 993 (1922), one of the justices of the Montana Supreme Court was incapacitated by illness and a district court judge was called in to sit in his stead. The decision was rendered by a divided court, the district judge voting with the majority. Before the petition for rehearing was heard, the incapacitated justice had died and his vacancy was filled by an appointment. The

petition for rehearing was denied for the reason that it did not present any question which had not been fully considered by the court in rendering its decision, and on petition nothing was presented to change the opinion of any member of the court who participated in the original decision. The opinion on the question of rehearing was rendered per curiam, the same district judge again participating in the place of another member of the court at that time incapacitated by illness, but the new appointee took no part; there is, however, a notation following the opinion stating that ''while MR. JUSTICE FARR [the new appointee] takes no part in deciding the petition for rehearing, he agrees with the views herein expressed as to the reasons for his not participating.'' The effect of the decision was that the court adhered to the principle that the newly appointed justice should be excluded from passing on the petition for rehearing, notwithstanding that at that time he was a fully qualified member of the court. It said: ''MR. JUSTICE FARR has not given any consideration to this case on its merits, and expresses no views thereon. For him to now participate in the consideration of the petition for rehearing would require that he consider the case on its merits, and, if after so considering the case he should be compelled to disagree with the conclusion reached by MR. JUSTICE GALEN and concur with the dissent of JUSTICES COOPER and HOLLOWAY, the ultimate effect would be to reverse the decision made just shortly before he became a member of this court. The real effect of such a conclusion, in the opinion of all the Justices, would be to establish a precedent that might have mischievous and unfortunate results.''

*Golden Valley County v. Greengards,* 69 N. D. 171, 284 N. W. 423 (1938, 1939), was decided by a divided court, three members concurring in the majority opinion and two dissenting. Before the petition for rehear-

108

ing was decided, one of the justices concurring in the majority opinion retired and was succeeded by a new justice. The court in denying the petition for rehearing recognized that the petition could be only a reargument of questions determined by the former court and held that the fact that there had been a change in the composition of the court did not afford any reason for a rehearing. The same result obtained in an earlier case in North Dakota, *Carroll v. N. Y. Life Ins. Co.,* 49 N. D. 798, 193 N. D. 471 (1922, 1923).

The principles enunciated by the Utah, New Mexico, Montana and North Dakota courts had been earlier established and followed in New York (*People v. Mayor of New York,* 25 Am. Decisions 669 (1840)); in Michigan (*McCutcheon, Adm'r v. Common Council of Village of Homer,* 43 Mich. 483, 5 N. W. 668 (1840); *People v. Evening News Ass'n,* 51 Mich. 11, 16 N. W. 691 (1883)); and in Minnesota (*Woodbury v. Dorman,* 15 Minn. (Gil.) 274 (1870)).

The majority opinion readily concedes that "*Woodbury v. Dorman,* 15 Minn. (Gil.) 274, *Gas Products Co. v. Rankin,* 63 Mont. 372, *Cordner v. Cordner,* 91 Utah 474, and *Flaska v. State,* 51 N. M. 13, support plaintiffs' contention that successor judges should not act on a petition for rehearing of a case decided during the incumbency of their predecessors," but it seeks to minimize the force of these cases, which are precisely in point, by summarily disposing of them with the statement that "these decisions are based on grounds of expediency." *Woodbury v. Dorman* is referred to as stating the theory of these decisions and exposing "its weakness." In that case two members of the court who joined in denying the application for rehearing because, as they said, a reargument would be a *violation of proprieties* in the administration of justice and tend to destroy respect for and confidence in judicial tribunals, reserved the right in any future case

109

that might come before the court to re-examine the question *res nova* of what they considered to be a mistaken rule of property, and overrule the decision "if our present views should remain unchanged." It is significant that, notwithstanding the disagreement of these two judges with the rule of property laid down in the original and controlling opinion, they joined the other member of the court in denying the application for rehearing; nevertheless the majority in the instant proceeding conclude that "surely it would have been better [in *Woodbury v. Dorman*] . . . if the court had re-examined the question involved as to the validity of the mortgage as *res nova*. Its decision then would have rested on the sound judgment and conviction of the court and not on judicial courtesy." This argument begs the question and entirely overlooks the vital point here under consideration; it also carries with it the implication that the original majority opinion of JUDGES TUOHY and FEINBERG was conceived in error and that the majority opinion of the newly constituted court, which reverses the original decision, rests "on the sound judgment and conviction of the court." The majority brush aside entirely the *proprieties* enunciated in the cases cited and discussed herein, and embrace instead the "right" of the newly constituted court to act. They say that this right, as expressed in the lone California jurisdiction, "is consistent with Illinois practice." They admit, however, that they "find no reported Illinois case in which the question presented by plaintiffs has been decided," but say that "in at least two cases newly elected justices of the Supreme Court have participated in the disposition of petitions for rehearing of cases in which the opinion had been filed prior to their election and qualification." *Lees v. Chicago and N. W. Ry. Co.*, 409 Ill. 536 (1951), is one of the cases to which reference is made. In that case the question was not raised; moreover the case

110

was decided by a court on which there still remained a majority who participated in the decision. Shortly after the instant case was reargued defendants submitted a written memorandum reviewing the history of *People ex rel. Lawrence v. Village of Oak Park,* 356 Ill. 154 (1934). This is the other case cited in the majority opinion as being ''consistent with Illinois practice.'' That case certainly does not support the adoption of the dangerous policy of judicial administration to which the majority subscribe. Four members of the Supreme Court (JUSTICES ORR, STONE, DE YOUNG and JONES), constituting the majority of the seven-member court, were on the bench during the entire time the case was in the Supreme Court. The decision clearly indicates that the court did not pass upon the merits of the cause but dismissed the appeal because they considered the controversy moot. The question of the propriety of the new members of the court to pass upon the merits of the controversy was, not raised or argued, as shown by an examination of the briefs, and of course the situation in the *Lawrence* case is not analogous because in the instant proceeding JUDGES TUOHY and FEINBERG are still readily available pursuant to a temporary reassignment order of the Supreme Court to review their own decision and pass upon the petition for rehearing.

Although the precise question has never been decided in this State, the fundamental principle of the foregoing decisions was enunciated and adhered to in *Garrett v. Peirce,* 84 Ill. App. 31 (1899). Plaintiffs there had originally filed a bill to foreclose a mortgage. The trial court sustained a demurrer and dismissed the bill. On appeal the Appellate Court reversed the trial court, held that the bill stated a cause of action and remanded the cause (*Peirce v. Garrett,* 65 Ill. App. 682). The case then proceeded to a decree which was reversed in *Garrett v. Peirce,* 74 Ill. App. 225, for errors

111

in the decree, following which the trial court entered another decree of foreclosure which became the subject matter of the appeal in the case cited as 84 Ill. App. 31. The justices who first decided the case were no longer members of the Appellate Court. The contention that the complainants could not maintain the bill was again argued by defendants in the third appeal, but the court declined to consider those questions and said that "the brief of plaintiffs in error is devoted chiefly to another discussion of the same questions presented when the case was first here. We are still of the opinion that the first decision of this court must be treated as the law of this case until the Supreme Court decides otherwise. *As an ordinary rule a mere change in the membership of an appellate tribunal ought not to reopen in the same case questions once settled by it. Such a course would introduce great confusion.*" (Italics supplied.)

In all the cases cited herein there remained on the court a substantial number of the members who had joined with the majority in the decision of the appeal. I find no case in any jurisdiction where there remained in the reconstituted court only the dissenting member. In the instant case there is less justification for entertaining and allowing the petition for rehearing than in any of the reported decisions.

*As to the merits of the case.*

2. Without unduly extending these combined opinions, I wish to emphasize, as briefly as possible, the sharp variations between the original and the present majority opinion, both as to the interpretation of the salient facts and the law applicable thereto.

Defendants take the position, and the majority now hold, that when the hope or expectation of renewal of the lease was extinguished, Silverman, who had acquired and become the owner of all the stock of Essaness, acting in his own interest, was "free to negotiate

112

independently of the partnership'' and go in and buy the Woods Theatre property without breach of his fiduciary relationship to plaintiffs. In essence, the present majority opinion reaches the conclusion that from the latter part of January until the Franciscans by letter of April 25, 1949 finally advised Essaness that they would not grant an extension or make a new lease, Silverman continued his efforts to obtain a renewal, and only when all hope or expectancy had ended, and because he was convinced that the Woods partnership could not successfully finance so large an undertaking, did he decide to purchase the property for himself.

The original opinion, written by JUDGE TUOHY and concurred in by JUDGE FEINBERG, and the record as I view it, present an entirely different picture. According to the testimony of Arthur Rubloff, a Chicago realtor whose recollection was refreshed by a memorandum made at the time, Silverman, as early as June 11, 1946 told Rubloff in a telephone conversation that he planned a new corporation to take over the theatre property at a price of $1,800,000 in the expectation of giving a twenty-year lease on the theatre at $100,000 a year; that the then effective lease was controlled by a number of interests with which he was ''not concerned''; that he would go along with those interests until 1951, when the new corporation would take over. He offered Rubloff ten per cent of the new corporation. This evidence is significant as indicating that three years before the actual negotiations began, Silverman was even then considering acquiring the property, not for his beneficiaries but for himself or a corporation which he would control. On September 22, 1948 Nash, an officer of The Real Estate Corporation which throughout the entire transaction acted on behalf of the Franciscans, notified Stern, an employee of Essaness, that the Franciscans would not exercise their right of termination in the year 1949. After the re-

113

ceipt of that letter Stern commenced negotiations for an extension of the lease beyond April 1951. There were talks on the subject in January and February 1949. Silverman, who went to California in the early part of March, stated that up to April 18, 1949, when he returned to Chicago, he had never discussed anything except the leasing of the theatre; but Stern testified that he had been advised by Nash that Silverman had, early in March 1949, requested Nash to contact Blackman, Silverman's attorney, for the purpose of continuing the talks and transactions in connection with the *sale* of the Woods Theatre building. According to Nash, this conversation took place before Silverman went to California. Nash was not called to deny this conversation. Stern also testified that about the middle of March 1949 he talked to Silverman at the Racquet Club in Palm Springs, California. "He did not tell me that he had been discussing the Woods Theatre with Mr. Blackman over the telephone. Mr. Silverman told me that he had heard there were a number of people trying to purchase the Woods property and fee. He mentioned some names. . . . He didn't say that he was one of the persons trying to buy the Woods Theatre and fee. . . . After Mr. Silverman returned to Chicago in April 1949, the first time we discussed the Woods Theatre was around approximately the 21st or 22nd of April." The following questions and answers are revealing: "Q. What did he say? A. He told me he was dealing and trying to purchase the Woods building and fee, and there were a lot of other people trying to do the same thing, and he cautioned me not to say anything to anybody, including my wife. . . . Q. Did you tell your wife? A. I did not, no. Q. Did you tell anyone about it at that time? A. I did not." Stern was not a member of the Woods Theatre partnership, but his wife was. This is significant in view of defendants'

114

contention that Silverman had advised Stern of his intention to buy and that it constituted notice to the partnership. There is also the testimony of Silverman that between March 1–9, when he left for California, he instructed Blackman to investigate on behalf of Essaness the mortgage possibilities of the property so that in the event Ben Gold's offer (which was ultimately rejected by the Franciscans) did not materialize, unhurried consideration could be given to the question of going ahead with an offer of purchase by Essaness. Subsequently, on April 26, when the formal contract for the purchase of the property was signed, Silverman for the first time announced at a meeting that he had ascertained that the property could be purchased for $1,200,000, subject to the additional payment of $50,000 as broker's commission, and also that a loan of $750,000 could be obtained from the New England Mutual Life Insurance Company. Up to this time none of the plaintiffs knew that Silverman was purchasing the property, except Stern, who had been so advised by Silverman two or three days before and cautioned not to disclose the fact to anyone, including his wife. Morris Glasser testified that on arriving home, about midnight of April 25 he telephoned Silverman in compliance with a message to call regardless of time; that Silverman told him that he had spoken to Stern and asked Stern to get in touch with him (Glasser); that something had come up in connection with the Woods Theatre; that the Franciscans had been negotiating for the sale of the property and ''if we wanted to protect our interests we would be able to work out a deal to buy the property.'' After a short discussion Silverman suggested that Glasser meet with him the following day to discuss the matter further in the hope of reaching some conclusion. Pursuant to their telephone appointment, Glasser went to Silverman's office at eleven o'clock on April 26. Stern

115

was there, and Blackman arrived shortly thereafter. Glasser testified that Blackman had not discussed with him the possibilities of purchasing the Woods property prior to the conversation that he had had with Silverman on the evening before. "Neither Mr. Silverman nor Mr. Stern had ever mentioned it to me. I had never been approached by anyone representing Essaness Theatres Corporation about the purchase of Woods Theatre Corporation." Glasser stated that at this conference Silverman started the discussion by saying that there was little more to add to what he had said the night before, that there had been negotiations for the sale of the Woods property, that it could be purchased for $1,200,000 subject to the payment of $50,000 as broker's commission, and that he could arrange for a loan of $750,000 from the New England Insurance Company. Blackman testified that either Nash or Silverman or both had told him some time prior to April 20, 1949 that the Franciscans were negotiating for the sale of the property to somebody at a figure around $1,600,000 and until those negotiations had concluded, they would not commence negotiations with Essaness; that about April 20 the negotiations with the other party had concluded without a sale being made; and that the "first time I was doing any actual negotiating for the purchase of this property was some time around April 20th. We were checking into the value of this property before then because we knew that negotiations had been going on with other parties for the sale of the property, and we were contacting various insurance companies to get a feel on what they would do in the way of a loan. I would say I started getting this feel to purchase the property several weeks before that. . . . Mr. Silverman was in California several weeks prior to April 20, 1949. I had frequent conversations with him by telephone. He or Mr. Nash told me about the possibilities of the

116

sale of the Woods property. . . . He told me that I should investigate it as a possibility for the partners or the Essaness Theatres Company. He told me either one or both. I don't think that I ever mentioned the possibility of purchase to any member of the partners prior to April 25, 1949." This evidence clearly indicates that negotiations with the Franciscan Fathers had been going on since March or early April without notice to any of the Woods Theatre partners, and that all the groundwork looking forward to the purchase of the property by Essaness had been laid and had apparently extended over a long period of time. It is inconceivable that a transaction of this magnitude could have been reduced to writing without considerable prior negotiation. On the record, only the salient portions of which have been summarized, it would be naive to conclude that on April 26, 1949 Silverman stepped in to buy the property only after he had been finally advised by letter dated April 25, 1949, which was the first written rejection of negotiations for renewal of the lease, that the Franciscans would not extend it. It strikes me as incredible that there could be such a casual and hasty consideration of a million dollar real estate transaction; rather it seems a fair inference from the circumstances related that he had coveted the property for approximately three years and had planned during that time and had finally taken definite steps to acquire it long before hope or expectation of renewal of the lease had terminated, without advising the Woods Theatre partnership of his intention so to do. His desire to acquire the property can be readily understood in the light of the steadily mounting income of the leasehold; during the year ending August 31, 1941 it yielded an income of only $23,013.08, and the following seven years the yield increased until in 1948 there was an income of $232,831.-51. In retrospect it is not surprising that, desiring,

as they did, to sell the property, the Franciscans were not anxious to negotiate an extension of the lease when arrangements for its sale were under way with Essaness as the prospective purchaser. If Silverman's desire to purchase the property had not been known to the Franciscans it is quite possible that, although their primary interest was to sell it, if a suitable purchaser could be obtained, they would have renewed the lease as they had on five previous occasions, with cancellation provision, until such time as they could find a suitable buyer. Notwithstanding their strong motivation for unburdening themselves of the property, it had been leased by the Franciscans on succeeding leases for seven years after they had acquired it, for the simple reason that they were unable to sell it on any satisfactory basis. Prospective sales to Gold and others had not materialized. The conclusion is inescapable that if the Franciscans had been unable to dispose of the property by sale, they would have continued to rent it rather than permit the theatre to remain idle. Silverman, by entering into negotiations as purchaser, destroyed every possibility that was then open to the Woods partnership for a renewal of the lease.

There is no question that a principal-and-agent relationship existed between the Woods partnership and Essaness. As to all matters within the scope of its agency, Essaness acted in a fiduciary capacity and was bound to the exercise of the utmost good faith in dealing with and concerning the interests of its principals; it could not regard the Woods property as fair game to acquire in competition with its principal, the partnership; and when it undertook to carry on negotiations for purchase of the property in competition with others who were seeking to acquire it, thereby defeating any possibility of the extension of the leasehold for the partnership, it violated a fundamental rule of the

118

law of trusts, which is well expressed in the following cases. In *Commercial Merchants Bank v. Kloth,* 360 Ill. 294, the court said: "Where one voluntarily assumes the confidential relation towards another, he will not be permitted, at the expense of such relation, to deal in the property of the opposite party for his own pecuniary profit. . . . The burden is on the fiduciary to show the fairness of any transaction between him and the grantor, . . . . Before a court of equity will permit a transaction between parties occupying a fiduciary relation to stand, the dominant party who has profited thereby must overcome the presumption of fraud by clear and convincing proof that he has exercised good faith and has not betrayed the confidence reposed in him."

The reasons for the rule are well stated in *Trice et al. v. Comstock et al.,* 121 Fed. 620, as follows: "For reasons of public policy, founded in a profound knowledge of the human intellect and of the motives that inspire the actions of men, the law peremptorily forbids every one who, in a fiduciary relation, has acquired information concerning or interest in the business or property of his correlate from using that knowledge or interest to prevent the latter from accomplishing the purpose of the relation. If one ignores or violates this prohibition, the law charges the interest or the property which he acquires in this way with a trust for the benefit of the other party to the relation, at the option of the latter, while it denies to the former all commission or compensation for his services. This inexorable principle of the law is not based upon, nor conditioned by, the respective interests or powers of the parties to the relation, the times when that relation commences or terminates, or the injury or damage which the betrayal of the confidence given entails. It rests upon a broader foundation, upon that sagacious public policy which, for the purpose of removing all temptation, removes all pos-

sibility that a trustee may derive profit from the subject-matter of his trust . . . ."

In the early case of *Davis v. Hamlin*, 108 Ill. 39, the basis for the rule was cogently explained: "Public policy, we think, must condemn such a transaction . . . . To sanction it would hold out a temptation to the agent to speculate off from his principal-to the latter's detriment. . . . If a manager of a business were allowed to obtain such a lease for himself, there would be laid before him the inducement to produce in the mind of his principal an underestimate of the value of the lease, and to that end, may be, to mismanage so as to reduce profits, in order that he might more easily acquire the lease for himself. . . . Although there was here no right of renewal of the lease in the tenant, he had a reasonable expectation of its renewal, which courts of equity have recognized as an interest of value, secretly to interfere with which, and disappoint, by an agent in the management of the lessee's business, we regard as inconsistent with the fidelity which the agent owes to the business of his principal." Numerous other cases cited in plaintiffs' brief and in the original majority opinion approve the well-established law of trusts enunciated in the foregoing decisions.

Defendants cite, and the present majority opinion largely relies on, *Crittenden & Cowler Co. v. Cowler*, 72 N. Y. Supp. 701, and *Thanos v. Thanos*, 313 Ill. 499, which, they say, is controlling. In the *Crittenden* case the defendant and one Barber were the sole directors of the plaintiff corporation. Barber threatened to deprive defendant of the management of the corporate business. Both he and the corporation then applied to the landlord for a new lease. The landlord thereupon proceeded to investigate the situation and after a meeting, at which Barber and all the stockholders of the corporation were represented, he decided not to lease to the corporation. In commenting on these circum-

120

stances the court said: "Here there was no secret leasing, no act done 'behind the back.' Here we have a positive refusal on the part of the landlord to accept the corporation as a tenant. This refusal, after application made and considered, disposed of and cut off that 'expectancy' which is declared by some authorities to run with every lease,—the expectancy of a renewal." Barber did nothing to accelerate the end of the expectancy, as Silverman did in the instant case by destroying all hope of renewal through negotiation with the Franciscans, while the expectancy still existed. In *Thanos v. Thanos,* the question was whether a leasehold was purchased with partnership funds or with the funds of an individual defendant, and it was held in effect that if the property was not purchased with partnership funds, such fact would constitute evidence that it was the intent of the partners that the property should not belong to the partnership. The facts in that case clearly distinguish it from the one at bar.

The classic pronouncement of JUDGE CARDOZO in *Meinhard v. Salmon,* 249 N. Y. 458, expresses the standard of conduct to which fiduciary in the instant case should be held: "Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions (*Wendt v. Fischer,* 243 N. Y. 439, 444). Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court."

■■■■■■■■■■■■■■■■

■■■■■■■■■■■■

The decree of the Superior Court should be reversed and the cause remanded with directions to enter a decree in conformity with the prayer of the complaint and as ordered in the original majority opinion.